Beacom, J.
This is one of several cases pending against defendant herein, all arising out of the insolvency of the Eirick & Robe Company, and similar in their facts.
In November, 1903, W. F. Eirick and Harry Robe organized the Eirick & Robe Company for the purpose of dealing in live stock at the Cleveland Union Stock Yards in Cleveland. Each of them had recently gone through bankruptcy.
These two owned substantially all the stock of the company, and $300 was'all the money ever put into the treasury for stock. The only other asset possessed by the company, with the exception of a small amount of office equipment,' was what Mr. Robe called on the witness-stand “brains,” Eirick having had about ten years experience in that line of business and Robe about twenty years. They began business at once and continued until about *178 November 1, 1905, when, being insolvent and having been for some time insolvent, they ceased business. More than ninety per cent, of their business was the selling of live stock on commission.
During the time they were in business they did their entire banking with the defendant bank, and the defendant at the beginning gave them credit of from three to five thousand dollars. This credit consisted in a permission to make overdrafts. These overdrafts were at first about $1,000, and they increased almost constantly until in the summer of 1905 they became as great as $17,000. On October 26, 1905, the overdraft was $15,207.60, which was reduced to $4,430.14 between that and the 1st day of November by crediting deposits to the reduction of this overdraft. On October 31 the bank refused payment of the company’s checks.
During all the time mentioned John F. Whitelaw was president of the defendant bank and also president of the Cleveland Union Stock Yards Company. At the time of the formation of the Eirick & Robe Company he was consulted about its formation. All the letter-heads of the company and all the printed matter sent out by it bore the statement in full faced type “Live Stock Commission, ’ ’ and that was the only indication upon such printed matter as to the character of-the business carried on by the company. All of said letter-heads and printed matter likewise had printed upon it in prominent type “Reference, National City Bank, Cleveland, Ohio,” This last has no importance herein except' that it would naturally suggest to the bank inquiry as to the financial condition of the company.
All these things were known to the bank. In May, 1905, a conference was held at the bank between Mr. Robe, Mr. White-law, John B. Foster, manager of the Cleveland Union Stock Yards Company, and Mr. Walsh, a stockholder thereof. Some conflict exists in the direct testimony as to what occurred at that conference, but it is plain and perhaps undisputed that the purpose-thereof was to consider the unsatisfactory condition of the Eirick & Robe Company, its methods of business, its expensive management, and its large and increasing overdrafts at the bank. Thereafter the size of the overdrafts were not diminished, although the amount of business done by the company, *179 judged by tbe amount of its deposits in tbe bank, was not as great as it had been at an earlier period. Defendant often complained of the condition of the account and urged a reduction of the overdraft, but it remained unreduced.' Defendant at some time prior to October 31, 1905, asked the company for a statement of its condition, but no statement was furnished.
About October 27, 1905, plaintiffs, buyers and shippers of live stock at Wellington, .Ohio, shipped two carloads of live stock'to the company to be sold by them on commission for plaintiffs. They were so sold. The net proceeds thereof was deposited with the defendant. This deposit was made in the form of two cheeks, one from the Cleveland Provision Company and the other from Swift & Company, both of them slaughter house owners. These cheeks represented not only payment for plaintiffs’ stock but payment for other stock also. The company, on October 27 and 28, mailed to plaintiffs two checks aggregating $929.11 in payment for these two carloads of stock.. The checks so given were by the plaintiffs through the bank at Wellington and its corresponding bank in Cleveland , and the Cleveland Clearing House, presented to the defendant bank for payment, and payment demanded and refused.
From these evidential facts the court finds the following general facts to be true :
1. The business of the Eirick & Robe Company was the selling of live stock on commission, and defendant knew it to be such.
2. The Eirick & Robe Company were insolvent long before October 31, 1905.
3. - Defendant knew that said company was insolvent. But if it did not know, it could.have known it and under all the circumstances should have known it.
4. The moneys sought to be recovered herein are for live stock sold by the company for the plaintiffs on commission, and of this defendant had constructive notice by reason of the char-' aeter of the company’s business.
From these findings of fact the court believes it should make these findings of law:
1. The fact that the Eirick & Robe- Company may have occasionally had moneys on deposit in this account which came from *180 sources other than the sale of live stock on commission can not defeat plaintiffs’ claim. That said company deposited a small sum of its own money at the beginning of its transactions with the bank, the fact that live stock was sometimes shipped to them with a draft attached to the bill of lading, the proceeds of such shipment eventually reaching the bank in the form of a deposit by the company, and the fact that occasionally other deposits from similar sources and of similar character may have been made, do not alter the fact that the business of the company was substantially that of dealing in live stock on commission, and that the defendant knew it and knew that the deposits made by the company with the defendant usually came from the sale of stock on commission.
In Van Allen v. The American National Bank, 52 N. Y., 1, which is a leading case on this subject, it is said, on page 7:
“When a trustee deposits trust moneys in his own name in a bank with his individual money, the character of the trust money is not lost, but it remains the property of the cestui que trust. If such money can be traced into the bank and it remains there, the owner can reclaim it. When deposited the bank incurred an obligation to repay it, which is not lessened or impaired because it incurred, at the same time, an obligation to pay other money belonging to the agent individually.”
Substantially the same language is contained in Union Stock Yards National Bank v. Moore, 25 C. C. A., 150:
“The right of the appellee to recover of- the appellant the moneys claimed depended upon the questions of fact whether the appellees were in equity the owners of the money claimed by them at the time the same was deposited by said company in said bank, and whether the officers of said bank, when it received such deposit, knew or had reason to believe that the deposit consisted of or contained moneys' not belonging to said company, but to the appellees or to others for whom the company was but the agent.”
2. The leading case on the questions involved herein is The Union Stock Yards Bank v. Gillespie, 137 U. S., 411. That case was decided adversely to the bank, but it does not follow that the same court would have decided this present case against the bank, for into that case there entered the element of fraud *181 or gross negligence, neither of- which are suggested in any way in the present case. The court will, however, read verbatim certain language from the opinion in that case:
“Rappal, Sons & Co. were in the commission business — known to the bank to be in that business. They were not buyers and sellers, but factors — agents to sell. Presumably, therefore, moneys deposited by them were the proceeds.of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and, while not of itself notice, is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. A bank is not ordinarily bound to inquire whence the depositor received the moneys deposited or what obligation such depositor is under to other parties. It is only when there gather around any deposit, or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable, cognizance, that it is debarred from treating the deposit as that of moneys' belonging absolutely to the depositor. We notice, therefore, the peculiar circumstances which cast knowledge upon this bank, in respect to these deposits. And this knowledge was not limited to the character of the business of the depositor, that of commission merchants, but extended to its results. The bank account of the Rappals is presented. It was a bank account of continuous and increasing overdrafts. [The opinion then states in detail what the account showed.] It is obvious from this account that the business of the Rappals was failing. The story of their failure was written by the officers of the bank on its books, and it knew all that such story told. It saw them failing in business. It knew their business was that of factor. It is obvious that the bank intended to arrest this continuing overdraft, and, familiar with the character of the business .of the Rappals, contemplated the seizure and appropriation of the proceeds of some consignment. The bank knew that the business of the Rappals was a failing one; that, instead of making money, they were gradually going deeper and deeper into debt. It knew that the Rappals were not buyers but simply consignees; and that the moneys received by them on account of sáles of right belonged to their consignors' and principals. ’ ’
Everything above cited from this opinion applies to the present' case. The bank knew that both Eirick and Robe had, before forming this corporation, gone through bankruptcy; that they began business with almost no financial resouees; that their *182 business was that of selling live stock on commission; that the overdrafts had from the beginning until the end continuously grown without that growth having even the apparent excuse in the later period of their operation of an increase in business; that the company was getting deeper and deeper and more hopelessly into debt. It became manifest to the bank that somebody must suffer from the failure of this company to make a success of its business, and when, on the 26th day of October the overdraft exceeded $15,000, and immediately thereafter large deposits were made in the defendant bank, these deposits were applied.to the liquidation of the overdraft.
Such being the conclusion of the court as to what are the facts of this case and the law applicable thereto, decree is entered in favor of plaintiffs for the amount claimed in the petition, with interest to the first day of this term of court, $1,033.63.
The court is of opinion that this case has thus been properly disposed of. In none of the cases called to the attention of the court has a plain and clear general rule applicable to all eases of this kind been laid down. Lord Eldon has said that a court should endeavor to do three things: First, decide the ease under consideration correctly; second, satisfy those to whom the decision is adverse that it has been correctly decided; third, lay down a general rule for the decision of similar eases. This court is of opinion that the general rule should be substantially of this character: Where a factor has been allowed by a bank to overdraw his account as a method of gaining a- line of credit, the. proceeds of goods consigned to the factor and sold by him and deposited in the bank can not be applied to the payment of such overdraft, if the factor be at the time insolvent. The knowledge or the want of knowledge on the part of the bank of the factor’s insolvency is not material. It is the fact of insolvency, the fact that the shipper by such application of the deposit must lose his property that determines the right of the consignor to treat the bank as a trustee holding his money for him. • Neither is it material that the bank does not certainly know at the time the deposit is made that the money belongs to a consignor and not to the factor. If this be not the rule, the risks of allowing the factor to overdraw fall not on the bank, where it should fall *183 because it has granted the credit, but upon the consignors. Otherwise, a bank might with safety give a line of credit to almost any commission merchant, and, if he failed to prosper, it could choose an opportune-moment, when shipments, sales and deposits were large, to balance the account by making use of the proceeds 'of consigned property. This is not just, and the law should not permit it.
Miller & Linder, for plaintiffs.
Squire, Sanders & Dempsey, for defendant.
This does not establish a burdensome or impossible rule. It only requires that a bank shall exercise caution in granting credit to persons who have in their possession little or no property except that which belongs to' others, and provides that if a credit given, can not be repaid by the factor out of his own property, it can not be repaid out of the property of others.