Argued at Pendleton May 3, affirmed June 22, argued on rehearing December 10, 1926, former opinion sustained February 1, 1927.

# JOHN DEMAS *v.* FIRST NATIONAL BANK OF BAKER CITY ET AL.

### (247 Pac. 151; 251 Pac. 62.)

**Banks and Banking—In Action Against Bank for Aiding in Breach of Trust by Depositor, Plaintiff must Show That Part of Fund was Held in Trust for Him, and That Bank Knew That There was Trust and Participated in Breach.**

1. In action against bank for aiding in breach of trust by allowing depositor to misappropriate trust fund, plaintiff must show that part of fund was *held* in trust for him, and that bank knew or had reasonable grounds for believing that there was trust, and participated in breach.

**Principal and Agent.**

2. Bank cannot knowingly permit an agent to use principal's funds to pay agent's debt to it.

**Banks and Banking—Bank Held not Liable for Dissipation of Trust Fund Prior to Notice of Its Nature.**

3. Bank *held* not liable for dissipation of trust fund prior to notice of its nature, since, in absence of such notice, it had right to assume that depositor was real owner.

**Banks and Banking—Bank Held not Liable for Participating in Breach of Trust, Though It Allowed Trustee to Pay Beneficiary's Debts to It and to Check Out Remainder, Where Trustee had Authority to Sign Checks and Notes for Plaintiff Beneficiary.**

4. Bank *held* not liable for participating in breach of trust, though it, with knowledge of trust, allowed trustee with authority to disburse trust fund according to respective interests of beneficiaries, to pay debts which they owed bank and to check out remainder, where trustee had authority to sign checks and notes for plaintiff beneficiary and plaintiff signed written declaration that bank was not indebted to him.

---

1. See 3 R. C. L. 551.
3. See 3 R. C. L. 549.

---

Evidence—Written Statement by Beneficiary Under Trust That Bank, Owed Him Nothing Held Entitled to Great Weight as Declaration Against Interest in Action Against Bank for Participating in Breach of Trust.

5.   Written statement by beneficiary under trust that bank owed him nothing *held* entitled to great weight as declaration against interest in action against bank for participating in breach of trust; rule being different than in case of oral admission.

---

Appeal and Error, 4 C. J., p. 644, n. 39.
Banks and Banking, 7 C. J., p. 645, n. 26, p. 658, n. 24, p. 659, n. 26, p. 669, n. 39.
Evidence, 22 C. J., p. 424, n. 20, 22.

From Baker: C. H. McCOLLOCH, Judge.

In Banc.

AFFIRMED.

For appellant there was a brief over the name of *Mr. Forrest L. Hubbard,* with an oral argument by *Mr. Thomas G. Greene.*

For respondent there was a brief over the names of *Mr. Jos. J. Heilner* and *Messrs. Nichols, Hallock & Donald,* with an oral argument by *Mr. Jas. H. Nichols.*

BELT, J.—Plaintiff, John Demas, is a Greek who came to this country in 1911, gaining employment at first as a section-hand and later as a sheep herder. Through industry and thrift he accumulated about $1,200. In 1916 he entered into a partnership with Chris Coleman and they purchased from the defendant George Spiropolis a band of sheep, paying part cash and giving a note and mortgage for the remainder. The following year this note was paid in full. Coleman and Demas dissolved partnership in 1917. Each, however, continued in the same business. Demas, who is a cousin of Spiropolis, again purchased sheep from him giving his note and mortgage,

which indebtedness was paid in 1918. George Spiropolis operated in the sheep business on an extensive scale and was a sort of "bell wether" among his countrymen in that respect. Where he led they followed. He was generally looked upon by those of his nationality as a financial genius and had the implicit confidence of all who dealt with him. Demas admits that Spiropolis, until 1918, had authority to sign his name to notes and checks. In 1916, money belonging to Demas was deposited by Spiropolis in his own name, but in 1917, Demas opened a separate account with the defendant bank. When Demas' account was overdrawn, Spiropolis would sign Demas' name to a note in favor of the bank and the amount would be credited to offset the overdraft. In 1917, when Demas sold his lambs the money was deposited in Spiropolis Bros.' account. For some time monthly bank statements of Demas and other Greeks similarly engaged were mailed to George Spiropolis. In other words, he acted as a sort of clearing-house for his fellow Greeks who were engaged in the sheep business. Demas claims in 1918 he had a full and complete settlement with Spiropolis and since that time the latter could only act when expressly authorized to do so. He does not claim, however, that he notified the bank of such limitation of authority.

In June, 1919, Chris Coleman, John Spiropolis, Gus Babetos and John Demas sold their lambs, as separate owners, to Rosenbaum Bros. & Company, of Chicago, at $9.75 per head and, for convenience and economy, a pooled shipment of them was made. The lambs when cut off from the ewes were counted by their respective owners before loading. Those belonging to Demas numbered 887. George Spiropolis

also sold his lambs to the same purchaser and they were included in this shipment.

As part payment, Skillern & Machern, the purchasing agents, drew upon Rosenbaum Bros. & Company for $40,000 and, with the knowledge and consent of those interested in the pooled shipment, made the draft payable to the order of George Spiropolis. The latter indorsed it and sent it by letter on June 17, 1919, to the defendant bank for deposit. On June 24, 1919, the bank collected the amount due on the draft and credited it to the account of Spiropolis Bros. A dispute arose with the purchasers whether some of the lambs shipped were February spring lambs, but finally the matter was adjusted and a second draft, for $6,625, which was the agreed balance due after certain deductions were made on account of the size of the lambs, was drawn in favor of George Spiropolis. This sum on July 12, 1919, was credited to Spiropolis Bros.' account.

George Spiropolis delivered the second draft in person and, according to the contention of plaintiff, then and there advised the bank of the respective amounts which the owners had in this fund of $46,625 realized from the sale. It is well to state at this juncture that Demas admits Spiropolis was expressly authorized to deposit the money in the name of Spiropolis Bros., to pay the bank the amount due on the note of $4,200 executed by him in its favor, and to distribute the remainder of the fund in accordance with the respective interests of the owners.

In substance it is the contention of plaintiff that, notwithstanding the defendant bank knew the above sum deposited in the name of Spiropolis Bros. was a trust fund and that plaintiff and others had certain interests therein, it permitted George Spiropolis to

misappropriate the same and accepted from him a portion thereof in payment of his indebtedness to it. Otherwise stated, plaintiff seeks recovery from the bank on the theory that it aided and participated in a breach of trust.

The defendant bank denies that it knew or had reason to believe that Demas had any ownership in the funds or that Spiropolis was acting as a trustee, but asserts that, if in fact Demas did have an interest therein, Spiropolis had at least apparent authority to distribute and check against the account as was done. Furthermore, the bank asserts that Demas, in consideration of a loan of $1,000 to him on December 6, 1920, executed and delivered to it his written acknowledgment to the effect that the bank was not indebted to him in any sum or amount and that he had no claim against it of any kind, character or description.

Relative to the last-mentioned defense, plaintiff in his reply alleges in brief that the bank procured this acknowledgment without any consideration therefor and through fraud and duress. Plaintiff avers that when he applied for this additional loan his sheep were out on the range in the winter season and were in danger of starving if money could not be had with which to purchase hay; that the bank realized his situation and took advantage thereof; that it falsely and fraudulently represented to him that it had no funds in its possession belonging to him but in truth at said time had more than $5,000 which he owned; and that the statements contained in the written acknowledgment are not true.

1, 2. For plaintiff to prevail in this suit against the defendant bank it must be established by a preponderance of the evidence: (1) That Spiropolis held

a portion of this fund in trust for him; (2) That the bank knew or had reasonable grounds for believing that such trust relationship existed; and (3) That the bank participated in the breach of trust as alleged. Plaintiff relies upon the well-settled rule of law that a bank cannot use a deposit to pay the individual debt of the depositor due it where it has knowledge that the deposit is held by the depositor in a fiduciary capacity and does not belong to him.   A bank cannot knowingly permit an agent to use his principal's funds to pay the agent's debt to it, for in such event there would be a participation in the breach of trust: *National Bank* v. *Insurance Co.*, 104 U. S. 54 (26 L. Ed. 693); *Union Stockyards Nat. Bank* v. *Gillespie*, 137 U. S. 411 (34 L. Ed. 724, 11 Sup. Ct. Rep. 118); *Van Alen* v. *American Nat. Bank*, 52 N. Y. 1; *Union Stockyards Nat. Bank* v. *Moore*, 25 C. C. A. 150 (79 Fed. 705); *Mayer* v. *Citizens' Bank*, 86 Mo. App. 423; *Cole* v. *Canadian Bank of Commerce*, 115 Or. 456 (239 Pac. 98).   The difficulty in the instant case is to determine whether the facts bring it within the rule thus announced.

We think there can be no question, in the light of the evidence, that Demas owned 887 lambs included in the pooled shipment and that the proceeds of the sale were held in trust for him by Spiropolis.   Notwithstanding the money was deposited in the name of Spiropolis, the question is always open, as stated in *National Bank* v. *Insurance Co., supra*, "To whom in equity does it beneficially belong?"   There is no difficulty relative to this phase of the case.

3. We next consider the question: Did the bank have knowledge that Spiropolis held a portion of this fund in trust for Demas?   Let us review the record from the beginning of the transaction when Spiropolis

mailed the first draft of $40,000 to the bank. Accompanying the draft was a letter by Spiropolis addressed to the bank, stating, "I have sold my lambs, price $9.75 and here enclose check for $40,000. Hurry this for money." When the lambs were shipped in June, 1919, Demas took the ewes back into the mountains of western Idaho and stayed with them as a herder until October of that year. No word came from him to the bank advising it of any interest in the money in question. Whatever knowledge the bank obtained was through Spiropolis. There is absolutely no evidence tending to prove that the defendant bank had notice of a trust fund until the time the second draft was deposited with it on July 12, 1919. We take it, therefore, that the bank, in the absence of notice to the contrary, had the right to assume that George Spiropolis was the real owner of the $40,000 draft at the time it was deposited to his credit June 24, 1919. Spiropolis Bros.' account, on the day prior to the last-mentioned deposit, was overdrawn $345.96. On the morning of July 12th and prior to the deposit of the second draft of $6,625, the balance in such account was $21,003.56. It is thus disclosed from the bank records that Spiropolis, from June 24th to July 12th, checked out $18,648.18. Is there any reasonable basis for a claim of liability against the bank on account of what transpired during this period of time? We think not. Whether Spiropolis had the real authority thus to check on this account is immaterial. He at least had the apparent authority so to do. To all intents and purposes he was the owner of the money deposited and the bank was bound to honor his checks. Demas and his associates had voluntarily placed this fund in Spiropolis'

possession and control and the presumption would follow therefrom that he was the owner of it.

When Spiropolis personally took the draft of $6,625 to the bank July 12th, he says that Paul Pollman, its cashier, and he sat at a table in the bank's office, and the former was advised of the number of lambs belonging to each party interested, whereupon Pollman then and there calculated the amount of money due each owner. It seems clear that Spiropolis and Pollman at this meeting proceeded to distribute the fund in accordance with the information furnished by Spiropolis as disclosed by the memorandum admitted to have been written by Pollman upon the letter-head stationery of the bank. From this writing it appears that "J. Demas" had an interest of $7,839.85 in the fund, after his proportionate share of the lamb loss had been deducted. Demas owed the bank $1,672.57, principal and interest on a note of $4,200 executed by him in December, 1918. Spiropolis checked on his own account in favor of Demas for $2,000 and then drew a check on the latter's account in favor of the bank for $1,672.57, signing "John Demas by G. R. S.," in payment of balance due on note. Spiropolis claimed that he had advanced Demas $500 in June 1919, so, as shown by the written statement, $2,500 was deducted from $7,839.85 to determine the net amount due Demas, viz., $5,339.85. The memorandum also shows that Coleman had $10,813.36 and Babetos and John Spiropolis $14,277 due them as their respective shares in the proceeds of the lamb sale. We are convinced that the bank must have known or had good reason to believe that there was due Demas as a result of this particular lamb deal the sum of $5,339.35, but it is doubtful if it then knew or ever did know the exact status of account between

Spiropolis and him. Their business relations were, indeed, intimate and their various deals difficult to follow even in the light of what the record now discloses. In view of the fact that the cashier of the bank prepared the check whereby Spiropolis transferred $2,000 out of the fund in question to Demas' account and then accepted therefrom payment for the amount due on its note, it is somewhat difficult to appreciate the bank's contention that it had no notice of Demas' interest. We pass to the next inquiry.

4. Did the bank participate in Spiropolis' breach of trust? We have heretofore determined there can be no liability against the bank on account of this breach prior to July 12th, for the cogent reason that it had no notice of a fiduciary relationship. We therefore direct our attention to the account of Spiropolis Bros. as of the last-mentioned date, when the bank had notice of a trust relationship as evidenced by the memorandum made by its cashier and the part the bank took in the allocation of the fund to the various owners. At the very threshold of our present inquiry it is well to bear in mind the admitted authority vested in Spiropolis by the beneficiaries of this trust to disburse it in accordance with their respective interests. No instructions whatever were given by them to the bank, so it necessarily follows that it was obliged to look to Spiropolis. Let us further trace the distribution of this fund in order to ascertain whether the bank permitted Spiropolis to use it in part payment of his debts to the bank, as that is the gravamen of plaintiff's charge. After the second draft of $6,625 was deposited there was a balance of $27,628.56 in Spiropolis Bros.' account. The bank held notes which had been executed by Coleman, Demas, Babetos and John Spiropolis which George

Spiropolis had indorsed guaranteeing payment.   Coleman had a net sum of $10,813.36 due him after deducting his proportionate share of the loss.   Spiropolis drew a check in Coleman's favor for $9,000, and then checked on the latter's account in favor of the bank for $7,700, in part payment of amount due on note.   The same procedure was had in each case, so that $24,000 of the Spiropolis Bros. credit balance was transferred to the credit of Coleman, Babetos, John Spiropolis and John Demas.   Out of such funds, the bank received in part payment on their notes the sum of $19,157, in addition to the amount of $1,672.57 in full payment of the Demas note.   At the close of the banking day on July 12th, Spiropolis Bros. had a balance of $3,126.56.

There is no evidence that George Spiropolis used any of the money belonging to these various beneficiaries to pay his direct liability to the bank.   It is conceded his liability as an indorser was reduced when such notes were paid, but was not the bank entitled to payment?   What if Babetos and the others had gone in person to the bank and asked to have their respective shares in this fund credited on their notes?   Would it then be contended that, by reason thereof, the bank participated in a breach of trust, even though the transaction inured to the benefit of George Spiropolis?

It is contended by Spiropolis that he gave directions to the bank to transfer to the account of the various owners the balance due them after payments on notes were made, but we place no credence in such claim in view of the fact that on July 12th there was not a sufficient deposit to pay the amount due.   There was $27,628.58 on deposit and the shares of Babetos, Demas, Coleman and John Spiropolis amounted to

$32,930.21. It would have been impossible for the bank to have carried out such instructions. Did the bank participate in a wrong when it allowed George Spiropolis to check on the balance of $3,126.56 remaining in the account after allotment to owners was made and it knew of Demas' net interest in the fund amounting to $5,339.85? It is to be remembered that Demas did not return from the mountains until in October, 1919, and the bank had no means of knowing of any limitation placed upon Spiropolis' authority. Before and after the transaction in question Spiropolis signed checks and notes for Demas with his approval and ratification, and it is only reasonable to infer that the bank believed he could check on this account if he saw fit. Of course, a different question would arise if the bank had notice that he was using the balance in the account for purposes foreign to the agency, but in view of the course of dealing between these parties, we think it was not incumbent upon the bank to sift out and run down at its peril every check drawn. As Paul Pollman, the cashier, stated: "The money was in his fund. We didn't know what his business dealings with the other people were, or what they owed him." Demas had vested Spiropolis with apparent authority to do the very thing that he did do and he cannot complain because the bank relied thereon. We agree with counsel for plaintiff that Spiropolis did not have apparent authority to use his principal's money to pay his own debt to the bank, but this was not done in the instant case. He used most of the funds, not to pay the agent's debt to the bank, but the principal's. It is this fact which, in our opinion, takes the case out of the rule announced by the authorities above cited.

After plaintiff learned of the bank's alleged breach of trust, he continued to deal with it for over a year. Consider the following loans made by the bank to him: November 5, 1919, $500 (this note was signed "John Demas by George Spiropolis"); November 6, 1919, $500; November 17, 1919, $9,000; November 8, 1920, $2,000, and on December 6, 1920, $1,000. All of these notes were paid, the last being paid in May, 1921, without the assertion of any claim or demand against the bank. Furthermore, Demas' statement that Spiropolis was not authorized generally to act for him is unquestionably refuted by the fact, as above stated, that Spiropolis signed Demas' name to a note for $500 in November, 1919, which the latter paid without objection.

5. In October, 1920, the bank first heard rumors on the street that Demas claimed it was indebted to him over $5,000 arising out of the distribution of the lamb sale fund, and, when he applied for an additional loan of $1,000 in December of that year, it informed him that if such was his contention no further business with him would be transacted. Demas thereupon made his solemn declaration in writing that the bank was not indebted to him in any sum and that he had no claim against it of any kind or description. Without reviewing the testimony relative to the execution of this writing, we believe it was not procured through fraud or duress. Oral admissions are viewed with caution, but not so with admissions reduced to writing. The statement made by Demas is entitled to great weight as a declaration against his interest.

After a careful consideration of the entire record, we are convinced that Spiropolis had at least apparent authority to do the very things of which

120 Or.—31

Demas now complains and upon which he predicates liability against the bank. No authorities have been cited for the reason we have found no case similar in facts.

The decree of the lower court awarding Demas judgment against defendant Spiropolis for $5,339.85 and dismissing the suit as to the defendant bank is affirmed.                                    AFFIRMED.

RAND, J., took no part in the decision of this case.

---

Former opinion sustained February 1, 1927.

ON REHEARING.

(251 Pac. 62.)

For appellant there was a brief over the name of *Mr. Forrest L. Hubbard,* with an oral argument by *Mr. Thomas G. Greene.*

For respondent there was a brief over the names of *Mr. Jos. J. Heilner* and *Messrs. Nichols, Hallock & Donald,* with an oral argument by *Mr. Jas. H. Nichols.*

BELT, J.—The able briefs submitted on rehearing have convinced the writer that, as to some phases of this most difficult and intricate case, he may have been "seeing through a glass darkly." It is nevertheless believed that a proper conclusion was reached in the original opinion. We are not convinced by the greater weight of testimony that the defendant bank participated in a breach of trust as alleged. The bank no doubt knew that Demas had a certain interest in the fund derived from sale of the lambs, but, as stated by Paul Pollman, the cashier, "The money

was in his fund.    We didn't know what his business
dealings with the other people were, or what they
owed him.''    It is true Demas testified he had a full
settlement with Spiropolis in June, 1918, but his tes-
timony is so uncertain and contradictory concerning
this matter that it has little weight.    Spiropolis con-
tradicts him by asserting that Demas, in 1919, was
still indebted to him.    The conduct of Demas, after
having acquired knowledge of the bank's alleged mis-
appropriation of his money, is utterly inconsistent
with a *bona fide* claim of liability.    As stated in the
former opinion, he continued to borrow money from
the bank, as evidenced by several notes, and payment
was made without asserting any claim against it.
Furthermore, we have his solemn, written declaration
that the bank does not owe him anything.    This
statement was not obtained through fraud or duress.
He should not complain if the court believes what he
says is true.    We conclude that Spiropolis was au-
thorized so to distribute this fund.    Demas did not
decide to bring action against the bank until after
his cousin, Spiropolis, became bankrupt.    In view of
all the facts and circumstances, we are not prepared
to say that the bank acted otherwise than in good
faith.

We adhere to original opinion affirming decree of
lower court.                    FORMER OPINION SUSTAINED.

RAND, J., did not participate in this decision.