## PEARSON v. BRENNAN.
### No. 2979.

Circuit Court of Appeals, First Circuit.
March 9, 1935.

John C. Coughlin, of Boston, Mass. (J. L. Hannan, Haven Parker, and Parkman, Robbins, Coughlin & Hannan, all of Boston, Mass., on the brief), for appellant.

John J. Fox, Jr., of Lawrence, Mass. (John M. Morrison and Sawyer, Hardy, Stone & Morrison, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a decree of May 24, 1934, of the Federal District Court for Massachusetts, enjoining the defendant-appellant, receiver of the Federal National Bank of Boston, Mass., from asserting any right in or to a certain check dated December 14, 1931, payable to the order of the Federal National Bank "a/c Lawrence Trust Co. Commercial Account," for the sum of $2,554.50, of which Lapham, Potter & Holden were the makers. The plaintiff Brennan and the receiver are the only parties before this court. Arthur Guy, Commissioner of Banks for Massachusetts, in charge of the Lawrence Trust Company since its failure, was a party in the court below; but the proceeding was dismissed as to him. The firm of Lapham, Potter &

Holden (Brokers) were also parties below; but, not caring to appeal, severance was had.

Brennan is a citizen of Lawrence, Mass. In December, 1931, he was the owner of 100 shares of stock of the Electric Bond & Share Company and 100 shares of the United Corporation. It appears that on December 10 he delivered the stock certificates to one O'Reilly, treasurer of the Lawrence Trust Company, directing the Trust Company to sell the stock and buy him 100 shares of General Electric; that Brennan indorsed the certificates before delivery and since then has not received the General Electric stock or the proceeds of the stock sold; that in authorizing the Trust Company to sell and purchase he did so without specifying what brokerage house should be employed either to sell the old or to purchase the new shares, or how it should otherwise proceed in effecting the transactions; that on the 10th or 11th of December the Trust Company forwarded the certificates representing the 200 shares to the brokers (Lapham, Potter & Holden) in Boston, directing them to sell the same and deposit the proceeds in the Federal National Bank to the credit of the Trust Company's "Commercial Department Account"; that the brokers sold the shares and on December 14, 1931, drew their check on the National Rockland Bank of Boston for $2,-554.50 (the proceeds of the sale), payable to the "Federal National Bank of Boston, a/c Lawrence Trust Co. Commercial Account"; that the brokers sent a clerk on the morning of that day with the check to the bank, who delivered it there; that, upon receipt of the check, the bank at once entered it as a credit upon the Commercial Account of the Trust Company; that the next day the check was presented for payment at the National Rockland Bank, but was refused, the brokers having stopped payment.

It further appeared that the Trust Company opened its commercial account with the Federal National Bank in June, 1931; that it then desired to clear checks drawn on it through the Federal Reserve Bank of Boston and at that time arranged with the Federal National to transfer daily sufficient funds to the Federal Reserve Bank to pay checks drawn against the Trust Company and sent there for clearance; that the custom of the two banks in the conduct of the business between them, and particularly so respecting the clearance of checks drawn against the Trust Company, was for the Federal Reserve to send daily to the Trust Company a list of all checks drawn against the Trust Company which had accumulated in the Federal Reserve on the previous day; that, upon receipt of the list, the Trust Company called the Federal National, gave it the total amount of the list, and instructed the Federal National to charge the Trust Company with it and pay the same to the Federal Reserve Bank; and that, upon receipt of such payments, the Federal Reserve would notify its representative at Lawrence to release the checks to the Trust Company. It further appeared that under this arrangement it was the custom for the Trust Company to send to the Federal National commercial paper properly indorsed to be credited to that account, and for the Trust Company to draw drafts on the Federal National and for the latter bank to honor them on presentation and charge them to the Trust Company in its Commercial Account. Such was the daily conduct of the banks from the time they entered into the arrangement in June, 1931, to the closing of both the Federal National and the Trust Company on December 15, 1931, on which day the Federal National was taken over by the Comptroller and the receiver was appointed, after which on the same day the check was presented for payment and payment was refused.

An exhibit was introduced in evidence from the books of the Federal National covering the Commercial Account of the Trust Company, showing the nature of the transactions between them from day to day, but only covering the period beginning December 2 and ending December 14, 1931. The first column shows whether, at the beginning of a given day, the Trust Company had a credit or a debit balance in the Federal National. Where no minus sign precedes the word "Dec." it had a credit balance, but where it had a minus sign there was a debit balance or overdraft. The second column represented drafts drawn by the Trust Company upon and paid by the Federal National, and sums paid by the Federal National for the Trust Company to the Federal Reserve Bank. The third column shows the deposits by the Lawrence Trust Company and credited to it on the books of the Federal National. And the fourth column shows the credit or debit balances of the Lawrence Trust Company at the close of business on any given day, the items marked with a star (*) being cred-

it balances and those marked "OD" being debit balances. There were no overdrafts or debit balances until the close of business December 7, and balances of this character continued from that time down to December 11, when the deposit column was credited with a loan of $100,000 by the Federal National to the Trust Company, so that, at the close of business December 11, it had a credit balance of $4,480.24. On the opening of business December 12 it had a credit balance of that amount, but on the close of business for the day it had a debit balance or overdraft of $9,232.27, so that on December 14 (December 13 was Sunday), the day of the deposit of the check in question, it had an overdraft or debit balance of $9,232.27. On December 14 there was a deposit of checks amounting to $24,820.28 to the credit of the Trust Company, but on that day the Federal National paid to the Federal Reserve to satisfy depositors' drafts on the Trust Company sent there for clearance the sum of $28,026.47, or nearly $4,000 more than the $24,820.28 of checks, including therein the check in question of $2,554.50, credited that day to the account of the Trust Company. It also charged against the account ten other checks of the Trust Company drawn against the Federal National and paid by it that day amounting to $45,686.76, plus $190.73 for three other small checks so drawn, so that, at the close of business on December 14, the Trust Company was owing the Federal National $58,324.09 on this account, and at the time of the deposit of the check in question earlier in the day the Trust Company owed the Federal National at least $9,232.27. This shows that on December 14, 1931, when the check in question was deposited, it was in fact credited to the Trust Company's Commercial Account and that this check and the other checks, in all amounting to $24,820.28, were credited to the Trust Company that day, and that the Federal National, on the same day, discharged that credit and about $4,000 more by paying $28,026.47 to the Federal Reserve to satisfy drafts drawn on the Trust Company by its depositors, to say nothing of its satisfying other obligations of the Trust Company drawn on it and amounting to more than $45,000.

In his bill the plaintiff, Brennan, in substance asserts that he is the equitable owner of the check; that the Federal National took it with notice of his right and ownership; that the bank acquired no rights as owner or otherwise in the check; and that the receiver of the failed bank should be restrained from prosecuting his suit on the check against the brokers and appropriating the proceeds for ultimate distribution among the creditors of the bank.

The contention of the receiver is that the check is a negotiable instrument; that the bank is a purchaser for value of the check without notice of any claim upon it by the plaintiff; and the bank being such an owner, he, as its receiver, has a right to maintain his suit upon the check. The District Court found that the bank and the brokers had no notice of any claim or right of Brennan to the funds (the proceeds of the sale of the stock) or to the check representing the same, and such finding is clearly warranted by the evidence. And, although the case of Latzko v. Equitable Trust Co., 275 U. S. 254, 48 S. Ct. 60, 72 L. Ed. 267, was called to the court's attention in support of the receiver's position, it held that the Federal National was not a purchaser for value; that that decision was not applicable to this case, for there the dominant purpose in the deposit of the check with the bankers (which was payable to the bankers for the account of the plaintiff) was to establish a credit in favor of the plaintiff, while in the instant case "the dominant purpose was *to transmit* funds belonging to the plaintiff." In this the District Court was clearly wrong. As above said, the brokers did not know and had no notice that the funds received for the stock belonged to the plaintiff, and the bank stood likewise as to the check or the funds the check represented. This being so there can be no doubt that the purpose of the brokers in making out their check payable to the Federal National, specifying that it was to be credited to the Trust Company's Commercial Account, was not to transmit funds belonging to the plaintiff. The brokers knew nothing about the plaintiff or his having any right or claim to the funds represented by the check. And such could not have been the purpose of the bank when it received the check and for the same reason. The dominant purpose of the brokers in making the check payable to the bank, providing therein that it be credited to the Trust Company's Commercial Account, and in delivering it to the bank was that the amount thereof should be credited to the account of the Trust Company; and the purpose of the bank, when it received it and credited it to that account, was the

same. Furthermore, the letter of the Trust Company directing the brokers to sell the stock instructed them to deposit the proceeds in that account in the Federal National. This provision in the check stated the terms on which the deposit was being made and upon which it was to be received, and the bank by complying with these terms and at once crediting the check to the Commercial Account of the Trust Company and honoring checks drawn against it furnished the consideration for the bank's acquisition of the check and made it a purchaser for value. The Trust Company has never objected to the credit nor asserted that it was not given at its direction and in accordance with its intention.

The District Court having found that the Federal National was not a purchaser for value of the check—that it had given no consideration for it—ruled that, on the failure of the bank, its authority to collect the check ended. If it had a mere naked power, its authority to collect the check would end on the bank ceasing to exist. But, as we have pointed out, the bank was a purchaser for value and the owner of the check, and its power to collect the same was a power coupled with an interest in the check and did not end on the bank ceasing to exist but survived for the benefit of the bank's estate. Had the Federal National acquired an interest less than full title, then also its authority to collect would be coupled with an interest in the check and would be irrevocable and could be exercised for the benefit of the bank's estate, whether the bank was a natural or artificial person and had ceased to exist. Hilliard v. Beattie, 67 N. H. 571, 573, 39 A. 897, and cases there cited; White v. Fernald-Woodward Co., 76 N. H. 83, 85, 79 A. 641; Chase Nat. Bank v. Sayles (C. C. A.) 11 F.(2d) 948, 957, 958; Taylor v. Benham, 5 How. (46 U. S.) 233, 272, 12 L. Ed. 130.

Furthermore, the check was a negotiable instrument, and the Negotiable Instrument Law of Massachusetts (G. L. Mass. c. 107, § 50), the state where the transaction took place, provides that "where the holder has a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien," and the Federal National being a holder for value, the authority to collect the check did not end on its ceasing to do business.

A so-called deposit slip, which contained in *printed form* a provision that as to all items of deposit the bank acts only as agent for collection and are deposited subject to final payment, was introduced in evidence through a witness who, before the closing of the bank, had been its assistant auditor, who stated that the slip accompanied the check at the time of its deposit. Based on the slip and the above testimony of this witness, the District Court found that the Trust Company and the Federal National had entered into an agreement, the provisions of which it construed to be that the Federal National received the check for collection only, even though it at once credited it to the Commercial Account of the Trust Company and on that day honored checks drawn upon it by the Trust Company in excess of those deposited to its credit.

If it be assumed, without deciding, that this witness had personal knowledge of what he testified to (which an assistant auditor in the ordinary course of banking business would not have) and was not testifying from his general knowledge acquired as assistant auditor and what he gathered from the printed form upon the slip, it does not follow that the District Court was justified in holding that the bank had no right in the check which it could enforce. The provision on the slip, if ever brought to the attention of the brokers or their clerk, was for the benefit of the bank, not of the Trust Company, and when the bank not only credited the check to the Trust Company's Commercial Account but, on the day of the deposit, honored checks drawn against that account far in excess of the amount standing to the credit of the Trust Company, it waived the provision on the slip, for by so doing it did exactly what it had reserved the right not to do.

Furthermore the formal *printed provision* upon the slip is in no way compatible with the *written provision* upon the face of the check, and what the bank in fact did. The condition of the deposit was, as expressed on the face of the check itself, that it be credited to the account of the "Lawrence Trust Co.'s Commercial Account"; and that the bank so understood the matter is shown beyond dispute by its immediately crediting it to that account and honoring checks drawn against it in excess of those deposited. It would not have met the terms of the deposit by doing otherwise.

In view of what we have said it is not necessary to pass upon the question wheth-

er the finding of the District Court to the effect that the Federal National did not rely upon the check in the advancements it made for the benefit of the Trust Company on December 14, 1931, and that it would have made the same irrespective of that check and the other checks deposited in the Trust Company's account that day, amounting to more than $24,000 against which large sums were paid for the benefit of the Trust Company (an extremely doubtful finding, if not clearly wrong), for it in no way detracts from the question we are here deciding.

The District Court also found that "at the time the Federal National Bank received the check for deposit it was insolvent and such insolvency was, or ought to have been known, to its officers." The plaintiff Brennan was not the depositor, nor was the check deposited for his benefit or at his instigation. If Brennan had been the depositor and had brought suit to recover the check, which he did not do, this finding of the District Court would avail him nothing without a further finding that he did not know and had no reason to believe that the Federal National was insolvent. No issue of fraud is raised by the plaintiff's bill and, in the absence of such an allegation and proof in its support, it could not be found that the Federal National, in receiving the check when insolvent, acted in fraud of Brennan and that on that account no title or interest in the check passed to the Federal National. St. Louis & San Francisco Ry. Co. v. Johnston, 133 U. S. 566, 574, 10 S. Ct. 390, 33 L. Ed. 683. The Commissioner of Banks for Massachusetts, the representative of the Trust Company, is not before this court. Nor are the brokers, although both were parties in the court below. Neither of them has claimed that it was not the intention of the parties that the check should be credited to the Trust Company's Commercial Account, or repudiated the credit as not complying with their intention and understanding.

It is urged by the appellant that the District Court was without jurisdiction in equity to entertain the plaintiff's bill. The parties went to trial there without raising or suggesting any such question and, not having done so, we regard it as waived. But had it not been waived we are of the opinion that the court had equity jurisdiction. Union Stock Yards Bank v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724.

It is also urged that, as there is no diversity of citizenship between Brennan and the Federal National and the amount involved is under three thousand dollars, the District Court was without federal jurisdiction over the controversy. While the court had no jurisdiction on such grounds, we do not regard it as without jurisdiction. The proceeding is one relating to the winding up of a national bank, of which the District Court had original jurisdiction under section 41, par. (16) c. 2, title 28 USCA. It involves the determination of whether the check is or is not an asset of the estate of the closed bank for distribution among its creditors. See Bates v. Dresser (D. C.) 229 F. 772, 773, and cases there cited; International Trust Co. v. Weeks, 203 U. S. 364, 366, 27 S. Ct. 69, 51 L. Ed. 224.

The decree of the District Court is vacated, and the cause is remanded to that court, with directions to dissolve the injunction and dismiss the bill, with costs to the defendant-appellant.

MORTON, Circuit Judge, concurs in the result.