# UNION STOCK YARDS BANK *v.* GILLESPIE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 79. Argued November 17, 18, 1890. — Decided December 15, 1890.

A bank, receiving on deposit from a factor, under the circumstances set forth in this case, moneys which it must have known were the proceeds of property of the factor's principal, consigned to him by the principal

for sale on the principal's account, of which moneys the principal was the beneficial owner, cannot, as against the latter, appropriate the deposits to the payment of a general balance due to the bank from the factor; and if it attempts to do so, the remedy of the principal against the bank is in equity and not at law.

*Chapman* v. *Forsyth*, 2 How. 202, and *Hennequin* v. *Clews*, 111 U. S. 676, distinguished from this case.

IN EQUITY. Decree for the complainants. Defendant appealed. The case is stated in the opinion.

*Mr. Edward O. Brown*, for appellant, cited : (1) on the question of jurisdiction, *Clarke* v. *Shee*, Cowper, 197, 199 ; *Mason* v. *Waite*, 17 Mass. 560, 563; *Merrill* v. *Norfolk Bank*, 19 Pick. 32 ; *Bayne* v. *United States*, 93 U. S. 642; *Wright* v. *Ellison*, 1 Wall. 16 ; *Oelrichs* v. *Spain*, 15 Wall. 211 ;· *Root* v. *Lake Shore &c. Railway*, 105 U. S. 189 ; *Parkersburg* v. *Brown*, 106 U. S. 487; *Litchfield* v. *Ballou*, 114 U. S. 190 ; and (2) on the merits, *Lambert* v. *Peyton*, 8 H. L. Cas. 1 ; *Wabash & Erie Canal Trustees* v. *Beers*, 2 Black, 448 ; *Crocket* v. *Lee*, 7 Wheat. 522; *Carneal* v. *Banks*, 10 Wheat. 181 ; *Harrison* v. *Nixon*, 9 Pet. 483 ; *Haven* v. *Wakefield*, 39 Illinois, 509 ; *Bolton* v. *Puller*, 1 Bos. & Pull. 539 ; *Ward* v. *Brandt*, 11 Martin (La.) 331; *S. C.* 13 Am. Dec. 352 ; *Ex parte Buckhause &c.*, 10 Nat. Bk. Reg. 206 ; *Chapman* v. *Forsyth*, 2 How. 202 ; *Hennequin* v. *Clews*, 111 U. S. 676 ; *Ex parte Dale*, 11 Ch. D. 772 ; *Knatchbull* v. *Hallett*, 13 Ch. D. 696 ; *Ford* v. *Hopkins*, 1 Salk. 283 ; *Miller* v. *Race*, 1 Burrow, 452 ; *Murray* v. *Lardner*, 2 Wall. 110 ; *Swift* v. *Tyson*, 16 Pet. 1 ; *Brooklyn City &c. Railroad* v. *Bank of the Republic*, 102 U. S. 14 ; *Atlantic Cotton Mills* v. *Indian Orchard·Mills*, 147 Mass. 268 ; *Currie* v. *Misa*, L. R. 10 Ex. 153 ; *Commercial Bank* v. *Hughes*, 17 Wend. 94; *Clayton's Case*, 1 Meriv. 554 ; *Misa* v. *Currie*, 1 App. Cas. 569 ; *Brandaō* v. *Barnett*, 12 Cl. & Fin. 787 ; *Bank of the Metropolis* v. *New England Bank*, 11 How. 234 ; *S. C.* 6 How. 212; *McDowell* v. *Bank of Wilmington*, 1 Harrington (Del.) 369; *Marsh* v. *Oneida Cent. Bank*, 34 Barb. 298; *Central Bank* v. *Connecticut Mutual Life Ins. Co.*, 104 U. S. 54 ; *Marine Bank* v. *Fulton Bank*, 2 Wall. 252 ; *Thompson* v.

*Riggs,* 5 Wall. 663; *Bank of the Republic* v. *Millard,* 10 Wall. 152.

*Mr. L. H. Bisbee* and *Mr. John W. Beebe,* (with whom were *Mr. John P. Ahrens* and *Mr. Henry Decker* on the brief,) for appellees, cited: (1) on the question of jurisdiction, *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Sims* v. *Brittain,* 4 B. & Ad. 375; *Williams* v. *Everett,* 14 East, 582; *Yates* v. *Bell,* 3 B. & Ald. 643; *Pannell* v. *Hurley,* 2 Collyer, 241; *Pennell* v. *Deffell,* 4 De G. M. & G. 372; *Bodenham* v. *Hoskyns,* 2 De G. M. & G. 903; *Frith* v. *Cartland,* 2 Hem. & Mil. 417; *Whitley* v. *Foy,* 6 Jones Eq. 34; *S. C.* 78 Am. Dec. 236; *Veil* v. *Mitchell,* 4 Wash. C. C. 105; *N. Y. Ins. Co.* v. *Roulet,* 24 Wend. 505; *Varet* v. *N. Y. Ins. Co.,* 7 Paige, 560; *Kilpatrick* v. *McDonald,* 11 Penn. St. 387; *Warner* v. *Martin,* 11 How. 209: and (2) to the merits, *Hogan* v. *Shorb,* 24 Wend. 458; *Moore* v. *Clementson,* 2 Camp. 22; *Baring* v. *Corrie,* 2 B. & Ald. 137; *Fish* v. *Kempton,* 7 C. B. 687; *Baltimore* v. *Williams,* 6 Maryland, 235; *Sheffield* v. *London Joint Stock Bank,* 13 App. Cas. 333; *Allen* v. *St. Louis Bank,* 120 U. S. 20; *Parker* v. *Phetteplace,* 1 Wall. 684; *Lytle* v. *Arkansas,* 22 How. 193; *Harriet* v. *Beal,* 17 Wall. 590; *Alviso* v. *United States,* 8 Wall. 337; *Dickenson* v. *Tillinghast,* 4 Paige, 215; *Nichols* v. *Martin,* 35 Hun, 168; *Duguid* v. *Edwards,* 50 Barb. 288; *Chesterfield Manfg. Co.* v. *Dehon,* 5 Pick. 7; *S. C.* 16 Am. Dec. 367; *Merrill* v. *Bank of Norfolk,* 19 Pick. 32; *Baker* v. *Exchange Bank,* 100 N. Y. 31; *Ex parte Kingston,* L. R. 6 Ch. 632; *Knatchbull* v. *Hallett,* 13 Ch. D. 696; *Overseers of the Poor* v. *Bank of Virginia,* 2 Gratt. 544; *S. C.* 44 Am. Dec. 399; *Wormley* v. *Wormley,* 8 Wheat. 421.

MR. JUSTICE BREWER delivered the opinion of the court.

On the 25th day of May, 1887, a decree was rendered in the Circuit Court of the United States for the Northern District of Illinois, in favor of appellees and against appellant, for $26,585.90. That decree is challenged by this appeal. Two questions are presented; one of right, the other of jurisdic-

tion. Ought the bank to be compelled to pay to the Gillespies such sum of money; and had a court of equity jurisdiction to entertain and render a decree in this suit? In respect to the first question, it may be premised that the Gillespies were the owners of certain cattle, which were consigned to the firm of Rappal, Sons & Co. for sale; that the proceeds of the sales made by the Rappals were deposited in the bank, — and it is for this money that the suit was brought. This general statement compels the equitable conclusion that, as the Gillespies owned the cattle, they ought to have the moneys received from their sale. The right of an owner of property is not limited to the property itself, but extends to everything which is its direct product or proceeds. But this outline does not present the questions involved in this case, and a more detailed statement of the facts is requisite. A. J. Gillespie and his two sons, Thomas E. Gillespie and Louis J. Gillespie, were citizens of Kansas City, Missouri, doing business there as A. J. Gillespie & Co. Frederick J. Rappal and his two sons, Lawrence L. Rappal and Frederick J. Rappal, Jr., were citizens of Illinois, engaged in the live stock commission business as partners under the firm-name of Rappal, Sons & Co., at the Union Stock Yards in Chicago. The Union Stock Yards National Bank was a bank organized under the laws of the United States, and also located at the Union Stock Yards in Chicago. The consignments were made in October, 1885. In the spring of that year, Frederick J. Rappal, Sr., went to Kansas City to work up business for his firm. On arriving there he formed a nominal partnership, at least, with William P. Bowen and Milton James, for the purpose of buying cattle and sending them to Chicago for sale. The partnership name was W. P. Bowen & Co. On behalf of this firm, the elder Rappal made a contract with the Gillespies, by which the latter were to advance the money for the purchase of cattle; to take charge of the forwarding of them, receiving in consideration therefor five dollars a car-load, afterwards changed to $2.50 a car-load; and in pursuance of this contract, Rappal selected and purchased the cattle in controversy, receiving from the vendors orders of which the following is a specimen:

"KANSAS CITY, Mo., *Oct.* 3, '85.

"Union Stock Yard & Transit Co., Chicago, Ill. :

"Please deliver to A. J. Gillespie & Co. four cars cattle, consigned from Shelby & Fulkeeson to us via C., B. & Q. R. R.

"MOUNTJOY, WHITE & Co.

"Deliver above cattle to Rappal Sons.

"A. J. GILLESPIE & Co."

Endorsed on the back the following : "Rappal, Sons & Co."

The allegation of the bill is, that the Gillespies, complainants, were owners of these cattle; and the contention is, that the proof does not establish this allegation, but shows that the Gillespies were not owners, but simply loaners of money on the security of the cattle. In respect to this, the learned Circuit Judge ruled as follows : "I hold that the cattle belonged to the Gillespies, or that the Gillespies were entitled to control them so far as necessary to protect themselves for advancements made on the purchases." This is a very accurate statement of the relations of the parties; and in equity the Gillespies may properly be considered the owners. They paid for the cattle; the orders for possession, equivalent to bills of sale, were in their name; they controlled the shipments; and until their money advanced and stipulated profits were received, they were equitably the owners and in control. The senior Rappal, or Bowen & Co., were agents to purchase, with a stipulation for compensation for services, in the amount received exceeding a named sum.

Rappal, Sons & Co. were in the commission business — known to the bank to be in that business. They were not buyers and sellers, but factors — agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and while not of itself notice, is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. We do not mean to be understood as implying that a bank receiving deposits from one whom it knows to be in the com

mission business receives every deposit in trust for any un-
known principal. A bank is not sponsor for all its depositors,
although it may know the character of their business. Its
relations to its depositors are those of debtor; and, generally,
receiving and paying out money on the checks of its depositors,
it discharges the full measure of its obligations. It is not
ordinarily bound to inquire whence the depositor received the
moneys deposited, or what obligation such depositor is under
to other parties. It is only when there gather around any
deposit, or line of deposits, circumstances of a peculiar nature,
which individualize that deposit or line of deposits, and inform
the bank of peculiar facts of equitable cognizance, that it is
debarred from treating the deposit as that of moneys belong-
ing absolutely to the depositor. We notice, therefore, the
peculiar circumstances which cast knowledge upon this bank,
in respect to these deposits. And this knowledge was not
limited to the character of the business of the depositor, that
of commission merchants, but extended to its results. The
bank account of the Rappals with the appellant, from the 1st
of January, 1885, up to and including the end of these trans-
actions, is presented. It was a bank account of continuous
and increasing overdrafts. Striking the balance, for the sev-
eral months, of the daily credits and overdrafts, the average
result against the Rappals, month by month, was as follows:
January, $1476.25; February, $3275.64; March, $2483.77;
April, $3122.20; May, $6526.03; June, $9850.46; July, $10,-
897.96; August, $12,494.05; September, $15,227.91; and in
the two days of October prior to that deposit which closed
the overdraft, the account was thus: October 1, $18,922.21,
overdraft; October 2, $18,454.89, overdraft. From the 1st of
August until October 2, only on three occasions — August 27
and 28 and September 3 — were there balances to the credit
of the Rappals, and those of small amounts.

It is obvious from this account that the business of the
Rappals was failing. The story of their failure was written
by the officers of the bank on its books, and it knew all that
such story told. It knew that it had, as hereafter disclosed,
given credit to the Rappals with the Kansas City dealers. It

saw them failing in business. It knew their business was that of factor, receiving and selling for others on commission. Why this particular occasion should be seized upon, the testimony does not disclose; but is it not obvious that the bank intended to arrest this continuing overdraft; and, familiar with the character of the business of the Rappals, contemplated, with or without their knowledge, the seizure and appropriation of the proceeds of some consignment?

Further, as heretofore suggested, it appears that the assistant cashier of the Kansas City Stock Yards Bank wrote to the cashier of the Union Stock Yards National Bank a letter of inquiry as to the financial standing, individual responsibility and nature of the business of Rappal, Sons & Co., to which this answer was returned:

"UNION STOCK YARDS NATIONAL BANK, *July* 20, 1885.

"*P. Connelly, Esq., Assistant Cashier, Kansas City, Mo.*

"DEAR SIR: Your favor of the 17th instant received. Rappal, Sons & Co. are a firm in good standing, financially and otherwise. I don't think they keep much ready money in the business, but F. J. Rappal owns large farms near Joliet, and is estimated worth $50,000 to $60,000. He is a man of high character and has always had good credit, even before he had any means.

"Yours truly,        G. E. CONRAD, *Cashier.*"

This letter was shown to the Gillespies, and they were informed at the same time that the Kansas City bank had arrangements for notification by telegraph in case any draft was not paid. The effect of this letter was to encourage confidence in the Rappals, whatever may have been the motive of the defendant bank; and, in this respect, it is fair to say that there is no evidence to justify the inference that it was known to be inaccurate or intentionally misleading; but here, as often elsewhere, results rather than motives are significant as to determining liability. Again, it will be noticed that the Gillespies were advised that non-payment of any draft would be promptly communicated by telegraph. That was in fact

the uniform custom of the defendant bank. It so happened
that the various shipments of cattle and the corresponding
drafts were on different days. The first shipment reached
Chicago, and the cattle were sold on October 2, — Friday.
The draft for the amount thereof, $6506.40, arrived the same
day and was presented to the Rappals, and not paid. No
explanation was given to the bank by the Rappals for the
non-payment. No notice was communicated by telegraph of
the non-payment, and no information was received at Kansas
City thereof until Monday, October 5. On Saturday, October
3, and Monday, October 5, the balance of the shipment, being
the bulk of the cattle, were received and sold, the major por-
tion being so received and sold on Saturday. As the draft
received Friday was not accepted or paid, if notice thereof
had been given promptly by telegraph, as was the custom,
and as the Gillespies were advised was the custom, they might
have protected the balance of the cattle, and prevented the
Rappals from receiving and selling them. It is fair to say
that the testimony shows, and so it was found by the Circuit
Judge, that this failure to telegraph was due to the negligence
of a clerk, and was not the intentional act of the bank; but
we cannot conceive that the question of motive is significant.
The result of the omission of the officers of the bank to tele-
graph Friday, whether intentional or accidental, was the same;
and the bank is equally responsible whether the result flowed
from negligent or intentional omission. Again, it must be
noticed that when, on Friday morning, the bank received the
draft, it was information to it that a shipment to the Rappals
accompanied the draft; and when the Rappals declined to pay
that draft, that fact suggested either that the Rappals had not
received the shipment or else that, having received it, they pro-
posed to appropriate the proceeds and repudiate the obligations
of factor to principal. When the sale tickets were deposited that
evening, it was notice that they had received the shipment,
and that for some reason they were contesting their liability
to the consignor. As the office of the Rappals was but four
or five hundred feet from the bank, it knew that it could
ascertain the exact facts; but it failed to make inquiry ; and

under those circumstances, failing to inquire and failing to notify the consignor and drawer, it is fairly held responsible for its ignorance of facts which it might easily have acquired knowledge of, and its omission to do that which both its custom and duty compelled it to do.

Summing up these various facts, it may be observed that the bank knew that the business of the Rappals was a failing one; that, instead of making money, they were gradually going deeper and deeper into debt. It knew that the Rappals were not buyers, but simply consignees and factors; and that the moneys received by them on account of sales, of right belonged to their consignors and principals. It knew from the draft received that a shipment had been made to the Rappals. It knew that it had failed to give notice of the non-payment of the first and smaller draft, and so had put it out of the power of the consignors to protect themselves against the subsequent misconduct of the consignees and factors. It knew, or was chargeable with the knowledge of the fact, that the consignors were confiding in the consignees and factors on the strength of the representations it had made. Upon non-payment of the first and smaller draft, it knew that it was in a position to easily acquire knowledge of the exact facts; and with its means of knowledge it remained inactive and silent. With all these matters resting in actual or imputable knowledge, it accepts from the Rappals, consignees and factors, the proceeds of the sale of cattle consigned to them by the Gillespies. Can it be that it is not held to know that it was taking from the Rappals the proceeds of complainants' property consigned to them for sale, to discharge their debt to it? While the obligation of a factor to his principal is not a debt created by one acting in a fiduciary capacity, within the meaning of the bankrupt law, as was adjudged in *Chapman* v. *Forsyth*, 2 How. 202, and *Hennequin* v. *Clews*, 111 U. S. 676, the question here is not as to the character of the obligation of factor to principal, but as to the liability of one who takes from a factor, in payment of his debt, moneys which he knows equitably belong to that factor's consignor and principal. Justice forbids the upholding of such a transaction, and demands that

the bank, receiving from the factor in payment of a debt from the factor to itself, moneys which it must have known were the proceeds of the property received from his consignor and principal, account to that principal for the moneys so received and appropriated. The question of right must be resolved in favor of the rulings of the Circuit Court, and it must be affirmed that the complainants are entitled to the moneys so received by the bank. It is equitable, therefore, that the decree be affirmed, if the suit be one of which equity may take cognizance; and so we pass to the second question, that of jurisdiction.

We are met with the proposition that equity ought not to interfere when the law furnishes a remedy; that when a bank has money in its possession which, in fact, belongs to a third party, received from whatever source it may be, an action at law will lie; and that, therefore, no case for equitable cognizance is presented. But this latter proposition has some limitations. It may be true if the full legal title to the moneys is in such third party; but it is not true when his title is equitable rather than legal; and the right of these complainants as against the bank, to the moneys deposited by their factor, is equitable. True, the obligation of a factor to his principal for moneys received on the sale of property consigned to him for sale is not a debt created by one acting in a fiduciary capacity, within the meaning of the bankrupt law, but it does not follow that no fiduciary obligation inheres in such debt. The case of *Chapman* v. *Forsyth*, 2 How. 202, turned not so much on the existence of a trust obligation as on the question as to what trust obligations were intended by the bankrupt act. The court observes: "The cases enumerated, 'the defalcation of a public officer,' 'executor,' 'administrator,' 'guardian,' or 'trustee,' are not cases of implied but special trusts, and the 'other fiduciary capacity' mentioned must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act." It cannot be doubted that an element of a fiduciary nature enters into the obligation of the factor — an element different from that

which exists in case of vendor and purchaser. There is a confidence beyond that in the capacity and willingness of a debtor to pay ; there is a reliance of a principal on his agent, a confidence that the agent will do as his principal directs, and be loyal to the duties springing from such relation. When property is consigned to a factor, and before sale, who doubts the continuing title of the principal, or his power to restrain unauthorized disposition of such property, or to compel observance by the factor of all the conditions of the trust reposed in him ? Can it be that on the moment of sale all these rights of the principal and consignor end, and that there has arisen in their place nothing but a simple debt from factor to principal, with absolute power on the part of the factor to dispose of the moneys received as he sees fit, and with no power on the part of the principal to challenge such misappropriation, when the party who receives the moneys knows the wrongful act of the factor ? While it may be true that a legal title to the moneys received on such sale is in the factor rather than in the principal, so that the principal may not maintain an action at law as against one receiving such moneys from the factor ; yet, equitably, those moneys belong to the principal, and equitably they may be followed into the hands of any person who receives them chargeable with notice of their trust character. The case of *National Bank* v. *Insurance Company*, 104 U. S. 54, is in point. In that case one Dillon was the agent of the insurance company. He kept an account with the bank — the account was entered on the bank books with him as general agent. As agent of the insurance company he collected, and it was his duty to remit, the premiums. In the course of his dealings with the bank he borrowed money on his personal obligation. Finally the bank sought to appropriate his deposits to the payment of this debt. The insurance company filed its bill in equity to recover the amount of those deposits as equitably belonging to it. The fact that they were premiums received for the insurance company was shown. It was held that, under the circumstances, the bank received them with knowledge that, though the legal title to the moneys was in Dillon, the beneficial ownership

was in the insurance company, and the decree in favor of the insurance company was therefore sustained. This court, by Mr. Justice Matthews, discusses the question of the liability of the bank to the insurance company and the necessity of a suit in equity to establish the rights of the company in these words: "It is objected that the remedy of the complainant below, if any existed, is at law and not in equity. But the contract created by the dealings in a bank account is between the depositor and bank alone, without reference to the beneficial ownership of the moneys deposited. No one can sue at law for a breach of that contract, except the parties to it. There was no privity created by it, even upon the facts of the present case, as we have found them, between the bank and the insurance company. The latter would not have been liable to the bank for an overdraft by Dillon, as was decided by this court in *National Bank* v. *Insurance Company*, 103 U. S. 783; and, conversely, for the balance due from the bank, no action at law upon the account could be maintained by the insurance company. But although the relation between the bank and its depositor is that merely of debtor and creditor, and the balance due on the account is only a debt, yet the question is always open, 'To whom in equity does it beneficially belong?' If the money deposited belonged to a third person, and was held by the depositor in a fiduciary capacity, its character is not changed by being placed to his credit in his bank account." See also *Manhattan Bank* v. *Walker*, 130 U. S. 267.

The case in 104 U. S., with the authorities cited in it, is decisive of this. The legal title to these moneys deposited was in the Rappals; so it was in that case in Dillon. The beneficial ownership is in the Gillespies; there it was in the insurance company. The circumstances surrounding the deposits, and the relations between the depositor and the bank, were such as to impart notice to the bank that the beneficial ownership was outside of the legal title. With that notice, it had no right to appropriate the deposits to pay the obligations of the depositor to the bank, but it was properly adjudged liable in a suit in equity, and in that alone, to the claims of

the beneficial owner. Here the beneficial owner was the Gillespies; the legal title was in the Rappals; but when they deposited with the bank, the latter received the moneys with notice that the beneficial ownership was elsewhere than in the Rappals. It could not in equity take them and cancel their private debt to it. What might have been the duty of the bank in respect to a check drawn by the Rappals upon these moneys, in favor of a third party, in view of their legal title and primary control, and what equities the Gillespies might have in case the bank had paid such a check, are questions not now before us, and in respect to which we express no opinion. We only decide that, under the circumstances of this case, the bank could not in equity take these particular deposits from the Rappals in payment of their debt to it. As the claim of the Gillespies against the bank was equitable purely, equity alone had jurisdiction.

We conclude, therefore, that the proper forum was sought, and the decree was right; and it is

*Affirmed.*