In re PROPERTY LEASING & MANAGEMENT, INC., Debtor.

Douglas WICKHAM, Trustee, Plaintiff,

v.

UNITED AMERICAN BANK, First Tennessee Bank, Knoxville, Tennessee, and the Federal Deposit Insurance Corporation, Defendants,

and

United American Bank of Memphis (formerly Central Trade Bank of Memphis and United American Bank in Memphis), Intervening Defendant.

FIRST TENNESSEE BANK, Knoxville, Tennessee, Counterclaimant,

v.

Douglas WICKHAM, Trustee, Counterdefendant.

UNITED AMERICAN BANK OF MEMPHIS (formerly Central Trade Bank of Memphis and United American Bank in Memphis), Counterclaimant,

v.

Douglas WICKHAM, Trustee, Counterdefendant.

UNITED AMERICAN BANK OF MEMPHIS (formerly Central Trade Bank of Memphis and United American Bank in Memphis), Cross-claimant,

v.

FIRST TENNESSEE BANK, Knoxville, Tennessee, and the Federal Deposit Insurance Corporation, Cross-defendants.

Bankruptcy No. 3–82–01397.
Adv. No. 3–82–1025.

United States Bankruptcy Court,
E.D. Tennessee.

March 7, 1985.

Bass, Berry & Sims, L. Wearen Hughes, Wallace W. Dietz, Nashville, Tenn., for plaintiff-trustee.

Bernstein, Susano, Stair & Cohen, Doris C. Allen, Knoxville, Tenn., for First Tennessee Bank, Knoxville, Tenn.

Morton, Lewis, King & Krieg, Deborah C. Stevens, Knoxville, Tenn., for Federal Deposit Ins. Corp.

Baker, Worthington, Crossley, Stansberry & Woolf, James E. Drinnon, Knoxville,

Tenn., for United American Bank of Memphis.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether certain repayments by the debtor of its indebtedness on two loans constitute avoidable preferential transfers under 11 U.S.C.A. § 547 (1979).

Also at issue is whether a bank attempting to assert its right of setoff with respect to funds in the debtor-depositor's checking account may be charged with knowledge of the trust character of the funds so as to preclude the bank's right of setoff of the funds against the debtor-depositor's own indebtedness to the bank. 11 U.S.C.A. § 553 (1979).

On September 17, 1982, Property Leasing and Management, Inc. (PLM) filed a petition for relief under chapter 11 of the Bankruptcy Code. On November 2, 1982, PLM commenced this adversary proceeding against the United American Bank in Knoxville (UABK) to recover certain alleged preferential transfers and to determine UABK's setoff rights regarding a bank account maintained by PLM at UABK. On December 16, 1982, the bankruptcy case was converted to a proceeding under chapter 7. UABK subsequently failed on February 14, 1983. Consequently, PLM's trustee in bankruptcy amended the complaint to add as defendants UABK's successors in interest, the Federal Deposit Insurance Corporation (FDIC) and First Tennessee Bank. On August 22, 1984, this court dismissed FDIC in its corporate capacity and First Tennessee Bank as defendants in the preference action. FDIC in its receivership capacity remains a defendant with respect to the action to recover preferences while First Tennessee Bank remains as a counterclaimant with respect to the question regarding the right of setoff.

The preference action concerns payments made by PLM on a $600,000.00 loan debt and on a $1,180,000.00 loan debt. The setoff question concerns the right of First Tennessee, as UABK's successor in interest, to apply funds in a PLM checking account against the $146,074.42 balance of principal and interest due on the $1,180,-000.00 loan.

For convenience and clarity the court will summarize separately the findings of fact relevant to each of these three transactions.

### I

### THE SETOFF QUESTION

During 1982 PLM maintained a bank account at UABK bearing the account number 03–6268–5. PLM described the account in its Statement of Financial Affairs as an "operating account." PLM was in the business of acting as rental agent for private homeowners and owners of local campgrounds in the rental of temporary accommodations to visitors to the 1982 World's Fair in Knoxville, Tennessee. PLM entered into written management agreements with the various property owners it represented. PLM's compensation for its services consisted of a percentage of the rental funds collected on behalf of the property owners. The agreements varied in form, specifically regarding PLM's duties respecting funds collected on behalf of the property owners. However, a number of property owners had management agreements with PLM containing the provisions set forth in paragraph 5 of Ex. 4–M:

5. All monies furnished by Owner as working funds and all monies received by Agent for or on behalf of Owner shall be deposited by Agent in a commercial bank and shall not be comingled [sic] with the funds of Agent. Such funds shall be disbursed by Agent in such amounts and at such times as the same are required to pay for obligations, liabilities, costs, expenses and fees (including, without limitation, the compensation of Agent as hereinafter provided) arising on account of or in connection with this Agreement. All amounts remaining after the payment of expenses and fees, shall be paid over to Owner monthly. Owner shall

reimburse Agent promptly for any monies which Agent may elect to advance for the account of Owner. Nothing herein contained, however, shall be construed to obligate Agent to make any such advances.

As indicated, PLM booked reservations for individuals intending to visit the World's Fair. PLM required a reservation deposit, with the balance payable at a later date. In the event of timely cancellation, the maker of the reservation was entitled to a refund of the deposit.

Contrary to the management agreement provision quoted above, PLM did not segregate the reservations deposits or other funds collected on behalf of the property owners. Instead, it commingled such funds in account 03–6268–5 along with funds from various other sources, including, for example, fees for inspection of property of owners wishing to participate in the rental program, loan proceeds, interest income, proceeds from the sale of World's Fair tickets, etc. PLM paid its general operating expense (including, for example, postage, telephone services, attorney fees, temporary help, various taxes, furniture rental, cleaning expenses, rent office supplies, etc.) with checks drawn on account 03–6268–5. PLM also withdrew funds from the account, invested them in certificates of deposit, and subsequently redeposited principal and interest in the account.

After the commencement of PLM's bankruptcy case, UABK attempted on or about September 20, 1982, to set off funds in account 03–6268–5 against a $146,074.42 debt owed by PLM to UABK. Upon learning of the bankruptcy case, UABK reversed the setoff entries and, pursuant to court order, deposited the funds in question ($146,074.42) in an escrow account pending a determination by this court of UABK's right of setoff.

■ The parties have stipulated that the property owners listed on pages 1–3 of Ex. 4–K all had the same Management Agreement with PLM. This agreement specifically provided (1) that funds received by PLM on behalf of the owners would be deposited and not commingled with PLM's funds, (2) that such funds would be disbursed by PLM as required to pay for "obligations, liabilities, costs, expenses and fees" arising in connection with the Agreement, and (3) that the balance remaining would be paid over monthly to the owners. Other property owners besides those listed on Ex. 4–K also had contracts with these same provisions.

In *Country-Uptown Motel v. PLM/Hotel-Motel Division,* 35 B.R. 499 (Bankr.E.D. Tenn.1983) this court held that no express trust was created by a reservation agreement which failed to require the segregation of funds collected or to explicitly restrict the debtor from using the funds for purposes unrelated to the agreement. This court specifically noted that the debtor "was not restricted by the terms of the agreement from commingling funds." 35 B.R. at 502. Here, in critical contrast, the agreement contains an express prohibition against the commingling of funds.

Furthermore, PLM was required only to transmit funds actually received. *Cf. In re Shulman Transport Enterprises,* 744 F.2d 293, C.C.H. ¶ 70, 138 (2nd Cir.1984) (provision requiring debtor freight forwarder to regularly pay carrier for freight transport services, whether or not debtor had collected for services from shipper, deemed indicative of debtor-creditor relationship, rather than fiduciary agency relationship, between debtor and carrier); *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981) (despite provision that travel agency held proceeds of ticket sales in "trust" for airline, contractual requirement that travel agency pay airline for tickets sold, whether or not agency received funds, established conventional debtor-creditor relationship).

This court finds that those management agreements containing provisions such as paragraph 5 of Ex. 4–M established a trust fund for the benefit of property owners who were party to such agreements with PLM.

■ Funds so held by PLM in trust for these property owners are not subject to setoff. Generally, a bank's right to apply a deposit, consisting of trust funds or funds belonging to one other than the depositor, to the depositor's individual indebtedness depends on whether the bank knows, or can be properly charged with knowledge of, the trust character or true ownership of the funds. 10 Am.Jur.2d *Banks* § 675 (1963). Ordinarily, when a party deposits funds in a bank, the funds become the bank's property, and the bank becomes the depositor's debtor. Thus, "there is mutuality of obligation, out of which the bank's right of setoff arises." [1] *Tonyan Construction Co. v. McHenry State Bank*, 28 B.R. 714, 725 (Bankr.N.D. Ill.1983).

■ But where a bank has knowledge of a third party's interest in deposited funds, or (absent actual knowledge) notice of facts sufficient to necessitate inquiry as to the deposit's true character, the debtor-creditor relationship is altered and the bank's right of setoff is subject to the rights of such a third party. The general rule is that the bank cannot set off such funds against the depositor's individual indebtedness to the bank. *In re Milano Textiles*, 38 B.R. 964, 967 (Bankr.D.Mass.1984); Annot., 8 A.L. R.3d 235, 242 (1966).

■ Although a number of courts have held that a bank's knowledge that the nature of the depositor's business is such that it customarily handles the funds of others is not sufficient to charge the bank with notice that deposited funds may belong to others, *Id.* at 259–60, UABK had here more than simply a general awareness that PLM's business involved the handling of funds belonging to third parties.

Harry James Thayer, Jr., a vice-president within UABK's real estate division, was involved in the various loan transactions with PLM. As part of the loan transactions Thayer visited and examined the PLM reservations operation. PLM furnished UABK with monthly, or at least relatively regular, reports respecting the extent of reservations bookings. Although Thayer denied specific or detailed knowledge as to whether the source of the funds in the PLM account was funds from reservations or operations, Thayer clearly knew in March 1982 that PLM had booked over $1 million in reservations. Thayer also knew that PLM was compensated by retaining only a percentage of the reservation funds collected for the property owners. Clearly, as part of the loan transactions UABK received information respecting PLM's reservations operations, and undoubtedly had access to information from PLM to the extent UABK deemed necessary to satisfy itself with regard to its loan transactions with PLM.

Perhaps merely being generally aware that a depositor's business involves the handling of funds belonging to others would not enable a bank exercising diligent inquiry to determine the true character of funds in a deposit. But the pronouncements of the United States Supreme Court in *Union Stock-Yards Nat. Bank v. Gillespie*, 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724 (1890) are instructive in this context:

[The depositors] were in the commission business,—known to the bank to be in that business. They were not buyers and sellers, but factors,—agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and, while not of itself notice, is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. *We do not mean to be understood as implying that a bank receiving deposits from one*

---

**1.** The Bankruptcy Code provides:

Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commence-

ment of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent [of exceptions not applicable here]....

11 U.S.C.A. § 553(a) (1979).

*whom it knows to be in the commission business receives every deposit in trust for any unknown principal.* A bank is not sponsor for all its depositors, although it may know the character of their business. Its relations to its depositors are those of debtor; and, generally, receiving and paying out money on the checks of its depositors, it discharges the full measure of its obligations. It is *not ordinarily bound to inquire whence the depositor received the moneys deposited,* or what obligation such depositor is under to other parties. *It is only when there gather around any deposit, or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor.* Union Stock-Yards Nat. Bank, 137 U.S. at 415–16, 11 S.Ct. at 119–120 (emphasis added).

Here, UABK was aware that PLM was an agent booking and collecting on reservations for property owners, was aware that PLM was entitled only to a percentage of those funds, had access to information from PLM respecting its bookings and accounts, and could have determined the property owners' interest as trust beneficiaries in the funds simply by examining or obtaining information to which it had unimpeded access. UABK could not neglect the obvious inquiry when it simply became more convenient or advantageous to do so. *See Tonyan Construction Co. v. McHenry State Bank,* 28 B.R. 714 (Bankr.N.D.Ill. 1983) (where bank maintained close scrutiny of debtor's affairs, reviewed periodic financial statements of debtor, had meetings regarding debtor's financial affairs, knew debtor was in construction business, and knew high balances in debtor's account were construction project payouts including moneys due to subcontractors, bank was deemed to have notice of sufficient information to put it on inquiry as to subcontractors' interest in funds, precluding setoff by bank).

The parties have stipulated that reservations collections were commingled in the account with funds from various other sources. However, this court is persuaded that the funds to which the property owners are entitled may be sufficiently traced and identified. On September 20, 1982, when UABK initially attempted setoff, the balance in the account was $216,638.59. The claims of property owners listed on pages 1–3 of Ex. 4–K total $103,322.57. Reggie Castle, president of PLM, testified that 80 to 85 percent of the deposits to the account were reservations deposits.

As noted, many various general operating expenses were paid from the account. The management agreement specified that expenses and liabilities arising in connection with the agreement were to be paid from the funds collected on the owners' behalf.

■ It is a fundamental principle of trust law that withdrawals for other than trust purposes from an account in which trust funds have been commingled with the trustee's own funds will be presumed to have been made first from the nontrust property. G.G. Bogert & G.T. Bogert, *Handbook of the Law of Trusts* 589–90 (5th ed. 1973); 76 Am.Jur.2d *Trusts* § 263 (1975). Thus, acknowledging the commingling of funds in the account and assuming that PLM made withdrawals from the account for purposes other than the trust purposes (of paying expenses and liabilities arising in connection with the management agreements), such withdrawals for nontrust purposes would be presumed to have been made first from PLM's own funds. The consequence of this presumption is that to the extent any portion of the commingled fund remains, it is subject to the trust in favor of the beneficiary. Thus, if the commingled fund is never reduced below the amount of the trust funds, the trust funds are preserved in their entirety; if the commingled fund is reduced below the amount of the trust funds (or completely reduced to a zero balance), the trust funds are dissipated to that extent unless

further traceable. 76 Am.Jur.2d *Trusts* § 263 (1975).

■ The parties have stipulated only that the lowest balance of the account during August and September was $16,972.21. (They introduced no proof as to low balances in preceding months.) PLM's president, Reggie Castle, testified that the $423,796.77 in principal and interest from certificates of deposit which were deposited in the account after the low balance in August were funds which had originally come from the account. Where from an account containing both trust property and the trustee's own property, the trustee withdraws funds and purchases an investment without designating its object or its source, and subsequently uses the remainder of the account for nontrust purposes, the majority view is that the investment is treated as having been made from the trust funds. G.G. Bogert & G.T. Bogert, *Handbook of the Law of Trusts* 582 (5th ed. 1973). Thus despite the low balance of the account in August, subsequent deposits in the account are attributable to trust funds. Although the account balance in August clearly dropped below the amount currently claimed to be trust funds, the account was subsequently replenished with invested funds which are presumed to have been trust funds.

Thus, UABK and its successor, First Tennessee, would be entitled to set off funds in the account only to the extent that the account balance exceeded the amount due property owners with management agreements with PLM containing provisions such as paragraph 5 of Ex. 4–M.[2]

PLM's trustee in bankruptcy contends additionally that this court should impress a constructive trust on the funds in the account in favor of individuals entitled to deposit refunds as a result of the timely cancellation of reservations. The court de-

clines to do so under the circumstances presented.

The mere failure to perform an agreement or to carry out a promise, or the failure to pay a debt, cannot in itself give rise to a constructive trust, since such a breach does not in itself constitute fraud or abuse of confidence or duty requisite to the existence of a constructive trust....

76 Am.Jur.2d *Trusts* § 224 (1975). *See also McKey v. Paradise*, 299 U.S. 119, 57 S.Ct. 124, 81 L.Ed. 75 (1936).

## II

### THE $600,000.00 LOAN

On March 16, 1982, PLM executed an Amended Promissory Note to the United American Bank in Knoxville (UABK) in the amount of $600,000.00. In conjunction with the promissory note PLM also executed an Amended Security Agreement, a UCC–1 financing statement, and a UCC–3 amendment to the financing statement. The financing statement and amendment to the financing statement were duly filed.

As the note was in exchange for the extension of a line of credit, PLM did not receive a lump sum loan of $600,000.00 at the time it executed the amended promissory note. Rather, it received the loan proceeds from UABK in various periodic disbursements. At the beginning of the 90-day period prior to the filing of its petition in bankruptcy, PLM had received a total loan of $575,000.00 pursuant to the note. PLM made three payments to UABK on this loan during the 90-day period prior to the filing of its petition: (1) $23,779.21 interest payment in June, (2) a $250,000.00 payment of principal in August, and (3) a $6,780.95 interest payment in August.

Section 547(b) of the Bankruptcy Code enables the trustee to avoid any transfer of the debtor's property (1) to or for the benefit of a creditor (2) on account of an ante-

---

**2.** The court does not have sufficient information to determine the claims of all of the property owners (besides those listed on pages 1–3 of Ex. 4–K) with management agreement provisions such as are set forth in paragraph 5 of Ex. 4–M.

However, the parties must obviously determine the extent of the claims of any such property owners in order to establish the extent of the funds in the account that are subject to an express trust.

cedent debt owed by the debtor before the transfer was made (3) made while the debtor was insolvent (4) made on or within 90 days before the filing of the petition and (5) that enables the recipient creditor to receive more than that creditor would receive if the transfer had not been made and that creditor received payment of the debt only to the extent to which it would be entitled under a chapter 7 liquidation. 11 U.S.C.A. § 547(b) (1979).

■ With regard to the three payments in question, defendant FDIC, as successor in interest to UABK, has not attempted to rebut the presumption of PLM's insolvency during the 90-day period preceding the filing of the bankruptcy petition. 11 U.S. C.A. § 547(f) (1979). The parties have stipulated that each payment was a transfer of the debtor's property to a creditor on account of an antecedent debt owed prior to the transfer and that each payment was made within 90 days before the filing of the petition. Thus, the determinative inquiry regards the final element of a preferential transfer under § 547(b)—i.e., whether UABK received more as a result of the payments than it would otherwise have received under a chapter 7 liquidation and distribution of PLM's property.

Section 547(b)(5) thus requires the court to determine the hypothetical situation the creditor would have occupied had no transfers been made during the 90-day period. Very simply put, to the extent the creditor is better off than it would have been without the transfers, it has been preferred over other creditors.

Here, had no transfers occurred on this debt, at the time of the petition the debt would have remained fully owing in the amount of both principal and interest.

$ 575,000.00
　23,779.21
　　6,780.96
$ 605,560.17　Total claim for debt assuming no transfers during 90 days

Next, the court must determine the extent to which the claim would have been secured and unsecured. A creditor has a secured claim only to the extent of the value of its collateral. To the degree that the claim exceeds the value of the collateral, the claim is an unsecured claim. 11 U.S.C.A. § 506(a) (1979).[3] UABK had a perfected security interest in the accounts

---

**3.** The $600,000.00 loan was part of a larger loan package involving loans to PLM and two other business entities. Pursuant to this loan package, the various loans were "cross-collateralized." Thus, the $600,000.00 loan to PLM was also secured by collateral given by the other entities in connection with the various other loans involved in the package. FDIC maintains that the court must consider such other collateral in determining the extent of UABK's secured status regarding the $600,000.00 loan.

The court, however, rejects FDIC's contention. The whole point of a preference determination is to ascertain whether, as a result of payments by the debtor during the 90 days, a creditor received more of the *debtor's* property than he would otherwise have been entitled to receive in a liquidation and distribution of the debtor's property. Obviously, then, the relevant question is the extent of the creditor's security interest in the property of the estate. It is that interest that determines the extent to which his claim is secured and the extent to which it is unsecured, insofar as his rights to a distribution of the debtor's property are concerned. The creditor's security interest in the property of other entities has no relevance whatsoever to this determination.

The test of a preference, as we have seen, is whether or not a transfer or payment will have the effect to pay on one claim a larger dividend, out of the estate of the bankrupt than that estate will pay on other claims of the same class. It is its effect upon the equal distribution of the estate of the bankrupt, not its effect upon the creditor, that determines the preference. The same dominant thought controls and determines the classification of the creditors. Those creditors who are entitled to receive out of the estate of the bankrupt the same percentage of their claims are in the same class, however much their owners may have the right to collect from others than the bankrupt. Their relations to third parties, their right to collect of others, the personal security they may have through indorsements or guaranties, receive no consideration, no thought. It is the relation of their claims to the estate of the bankrupt, the percentages their claims are entitled to draw out of the estate of the bankrupt, and these alone, that dictate the relations of the creditors to the estate, and fix their classification and their preferences.

*Swarts v. Fourth National Bank,* 117 F. 1, 7 (8th Cir.1902).

receivable of PLM.[4] The parties' stipulations indicate that the amount of those accounts receivable fluctuated dramatically both before and during the 90-day period preceding the filing of the petition. However, the only relevant question is what the secured status of the claim would have been on the date of the petition since that alone would determine the distribution to which UABK would have been entitled in a chapter 7 liquidation. On the date of the petition, PLM's accounts receivable were $53,513.00.

Thus, had no payments been made on the debt during the 90 days, UABK's hypothetical position would have been as follows:

| | |
|---|---|
| $ 605,560.17 | Total claim for debt assuming no transfers during 90 days |
| − 53,513.00 | Secured claim |
| $ 552,047.17[5] | Total unsecured claim for debt assuming no transfers during 90 days |

However, as a result of the transfers made during the 90-day period, UABK's actual position with respect to this debt was as follows:

| | |
|---|---|
| $ 325,000.00 | Total claim for debt |
| − 53,513.00 | Secured claim |
| $ 271,487.00 | Total unsecured claim for debt |

Clearly, UABK improved its position to the extent that it reduced the unsecured claim it would otherwise have had in the absence of the transfers. In short, it was preferred over other unsecured creditors to the extent of this improvement in position. The extent of that preference may be calculated as follows:

| | |
|---|---|
| $ 552,047.17 | Hypothetical unsecured claim for debt assuming no transfers during 90 days |
| − 271,487.00 | Actual unsecured claim for debt as result of transfers |
| $ 280,560.17 | Improvement in position as result of transfers during 90 days (i.e., preferential transfers) |

FDIC contends that the § 547(c)(2) "ordinary course of business" exception from avoidability[6] applies to the $23,779.21 interest payment made in June. There is a lack of accord among the courts regarding the applicability of this subsection to interest payments. *Compare Ford Motor Credit Co. v. Ken Gardner Ford Sales*, 10 B.R. 632 (Bankr.E.D.Tenn.1981) (interest payments made within 45 days after the interest accrued protected under § 547(c)(2) exception from avoidance by trustee) *with Whitlock v. Max Goodman & Sons Realty*, 21 B.R. 512 (Bankr.D.Mass.1982) (interest

---

**4.** The Amended Security Agreement provided for a security interest in the "accounts receivable, instruments, chattel paper, general intangibles and contract rights" of PLM. The amendment to the financing statement purported to also extend the security interest to items not described in the Amended Security Agreement— e.g., inventory, documents, equipment, and fixtures. In its pre-trial brief FDIC asserted that UABK held a security interest in all of these. In response, the trustee contended under various principles of Article 9 law pertaining to the requirements for and description of collateral and for perfection regarding certain types of property that UABK held a perfected security interest only in PLM's accounts receivable, contract rights, and general intangibles. The court need not, however, address this question. As a practical matter of proof, the parties have submitted evidence only as to the existence and value of PLM's accounts receivable. The court need not concern itself with the purely academic question of whether UABK would have had a security interest in other property where the parties have presented proof of neither the value nor even the existence of such property.

**5.** In making these computations, the court has disregarded the amount of any additional interest which accrued or would have accrued. Since the court is concerned only with the extent to which the transfers enabled the creditor to receive more on the debts actually paid (i.e., the $250,000.00 in principal and the $23,779.21 and $6,780.95 in interest) than it otherwise would have received, consideration of any additional interest is irrelevant.

**6.** This subsection provides:

(c) The trustee may not avoid under this section a transfer—

. . . . .

(2) to the extent that such transfer was—
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred;
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms; . . . .

11 U.S.C.A. § 547(c)(2) (1979).

payment within 45 days after due not within § 547(c)(2) exception).

■ Under § 547(c)(2) the transfer must have been "made not later than 45 days after such debt was incurred." 11 U.S.C.A. § 547(c)(2)(B) (1979). The determinative issue is thus when the debt for the interest was "incurred." In *Ken Gardner* Judge Kelley concluded that the debt for the interest was incurred when the interest accrued. Judge Kelley acknowledged that the debt for the *principal* of a loan is incurred when the loan is made and not when the installment payment comes due. Thus, an installment payment made within 45 days after coming due but more than 45 days after the principal loan debt was incurred is not within the § 547(c)(2) exception. *Ken Gardner,* 10 B.R. at 647. *See Barash v. Public Finance Corp.,* 658 F.2d 504 (7th Cir.1981); *In re Bowen,* 3 B.R. 617 (Bankr.E.D.Tenn.1980). Judge Kelley reasoned that the rationale behind so treating installment payments was that the debt for the principal was incurred when the debtor obtained the money and thus had a "legally binding obligation" to repay the money. *Ken Gardner,* 10 B.R. at 647. In contrast, he reasoned, the obligation to pay the interest did not arise until the interest accrued —i.e., there was no "binding obligation" to pay interest for one day until the next day. *Id.*

In *Iowa Premium Service Co. v. First National Bank,* 695 F.2d 1109 (8th Cir. 1982), the majority opinion followed a similar analysis. The court held that the debt for interest was incurred daily as each day's interest accrued rather than when the promissory note was executed. Emphasizing the "contingent nature" of the debt, the court concluded that a debt is incurred when the debtor becomes legally bound to pay and that the debtor had no obligation to pay interest until it had actually used the money on a given day. *Iowa Premium Service Co.,* at 1111–12. In contrast, however, the dissent concluded that the debt for the interest was incurred when the note was executed. *Iowa Premium*

*Service Co. v. First National Bank,* 695 F.2d 1109, 1113 (Ross, J., dissenting).

This court is not persuaded by the reasoning of the majority opinion in *Iowa Premium Service Co.* The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C.A. § 101(11) (1979). The Code further defines "claim" as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C.A. § 101(4) (1979) (emphasis supplied).

■ In determining for purposes of § 547(c)(2) when a debt is incurred, the " 'better view is that the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt.' " *Barash v. Public Finance Corp.,* 658 F.2d at 509 (quoting 4 *Collier on Bankruptcy* ¶ 547.38 (15th ed.)).

In the instant case the debt was incurred when PLM obtained the money loaned. Upon receipt of the money PLM had an unmatured liability for the principal and an unmatured and contingent liability for the interest. True, the extent of its liability for interest was dependent on how long it retained the money before repaying the loan. However, once it received the money it assumed a binding obligation, albeit contingent and unmatured, to pay for the use of that money.

This court is persuaded that measuring the incurrence of the debt for interest from the time when the loan is made best comports with the policy considerations underlying § 547(c)(2). The § 547(c)(2) exception is "a variant of the 'contemporaneous ex-

change' exception of § 547(c)(1)" [7] and "is aimed at transactions which, although they are technically credit transactions, are not intended to remain unpaid for a long time." *Barash v. Public Finance Corp.*, 658 F.2d at 511. *See also* Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am. Bankr.L.J. 173, 186–87 (1979).

This becomes clear when it is noted that the "underlying rationale of § 547(c)(2) appears to be the same as the 'current expense' rule under former law: 'no diminution of the estate, payment not for antecedent debt, and allowing the debtor to stay in business.'" *Barash v. Public Finance Corp.*, 658 F.2d at 511 (quoting Kaye, *Preferences Under the New Bankruptcy Code*, 54 Am.Bankr.L.J. 197, 202 (1980)).

In contrast to the basic equilibrium maintained when a contemporaneous exchange occurs or when goods or services are obtained and paid for in the normal trade credit cycle, the payment of interest on a long-term debt clearly diminishes the estate. Such a diminishment plainly impacts adversely on the policy of equality of distribution which is a "fundamental goal of the preference section under the Code." *Barash v. Public Finance Corp.*, 658 F.2d at 510. Further, this court doubts that excepting the interest component of a given payment on long-term debt while nonetheless avoiding that portion of the payment constituting repayment of principal can logically or realistically be said to meaningfully encourage the maintenance of normal business relations with a troubled debtor.

■■■ Thus, under § 547(c)(2) a debt is incurred when the loan is made. Neither payments of principal nor payments of interest made more than 45 days after the loan come within the § 547(c)(2) exception to avoidability.

■■■ In the instant case, although the note was executed on March 16, 1982, funds were loaned subsequently in various periodic disbursements. The $23,779.21 interest payment occurred on June 29, 1982. The 45-day period relative to this payment commenced on May 15, 1982, and ended on the date of the payment. Only one disbursement of additional principal occurred during this period: on June 4, 1982, $60,000.00 of additional principal was disbursed. Only that portion of the June 29 interest payment relating to interest accruing on this $60,000.00 disbursement may be said to come within the § 547(c)(2) exception. As no additional principal was disbursed within the 45-day period preceding the $6,780.95 interest payment on August 18, 1982, no portion of that payment comes within the § 547(c)(2) exception. Similarly, as no additional principal was disbursed within the 45-day period preceding the $250,000.00 payment of principal on August 18, 1982, no portion of that payment comes within the § 547(c)(2) exception.

Thus, the $250,000.00 payment of principal and the $6,780.95 payment of interest are avoided in full. The $23,779.21 payment of interest is avoided except to the extent that it represents the payment of interest accruing on the $60,000.00 disbursement on June 4, 1982.

### III

### THE "TICKET LOAN"

On April 28, 1982, PLM executed a promissory note to UAB evidencing a loan of $1,180,000.00 from UABK to PLM. PLM used the proceeds of this loan to purchase $1,180,000.00 worth of tickets to the 1982 World's Fair in Knoxville. PLM put the tickets in the possession of UABK to secure the debt. Subsequently, UABK periodically released blocks of the tickets to PLM to permit PLM to sell the tickets to

---

**7.** This subsection provides:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange; ....

11 U.S.C.A. § 547(c)(1) (1979).

the public. However, initially PLM did not have sufficient funds to pay for the release of tickets when it received them. Thus, it was necessary for UABK to release several blocks of tickets to PLM and permit PLM to sell those tickets to generate funds to begin making its payments on the $1,180,-000.00 loan. Jack H. Patrick, a UAB vice-president in charge of the real estate department, described the transaction as follows:

[Patrick:] It was intended, at the inception of every note, that as tickets were to be paid—or to be picked up, they were to be paid for. This created a problem for most of them [i.e., PLM and others involved in similar transactions], simply because it meant a substantial outlay of cash on the front end. So what we let them do was to pick up the first batch, sell those; and, when they come to pick up the second batch, they had to pay for the first batch. Therefore, if you picked up the last batch of tickets, or when you got down to the tail end, until that last batch was sold, you could have an outstanding balance on the note. Do you understand what I'm saying?

Q. All right. So, was it the intent at the beginning that, at the end, or toward the end of the process, that you may have a balance outstanding, even though you do not have any more tickets in the vault?

[Patrick:] That could be a possibility, yes. And that was the reason that—or one of the reasons, that these loans were done with very substantial customers of the bank. In other words, whatever the remaining balance was, if those particular individuals were to ask for that amount of money, we would probably have loaned it to them on an unsecured basis anyway, so it's—They were very substantial people.

Deposition of Jack H. Patrick (Ex. 6) at 44–45.

The time frame of the transaction and the relationship between PLM's payments and the release of the various blocks of tickets may be illustrated by the following table:

| (1982) | Payments | Balance | Tickets Released[1] | Remaining Tickets | Resulting Deficiency[2] |
|---|---|---|---|---|---|
| | | $1,180,000 | | $1,180,000 | –0– |
| 4/29 | | | $147,750 | 1,032,250 | $147,750 |
| 4/30 | | | 7,750 | 1,024,500 | 55,500 |
| 5/5 | | | 38,750 | 985,750 | 194,250 |
| 5/6 | | | 15,500 | 970,250 | 209,750 |
| 5/7 | | | 217,500 | 752,750 | 427,250 |
| 5/14 | | | 107,250 | 645,500 | 534,500 |
| 5/17 | | | 7,750 | 637,750 | 542,250 |
| 5/24 | $250,000 | 930,000 | | | 292,250 |
| 6/4 | | | 116,500 | 521,250 | 408,750 |
| 6/9 | | | 108,750 | 412,500 | 517,500 |
| 6/10 | 300,000 | 630,000 | | | 217,500 |
| | | | | | |
| 6/19 (90th day) | | 630,000 | | 412,500 | 217,500 |
| 6/21 | | | 133,500 | 279,000 | 351,000 |
| 6/24 | | | 15,500 | 263,500 | 366,500 |
| 6/25 | 351,000 | 279,000 | | | 15,500 |
| 6/30 | | | 38,750 | 224,750 | 54,250 |
| 7/2 | 15,500 | 263,500 | | | 38,750 |
| 7/8 | | | 77,500 | 147,250 | 116,250 |
| 7/9 | 38,750 | 224,750 | | | 77,500 |
| 8/10 | | | 147,250 | –0– | 224,750 |
| 8/11 | 77,500 | 147,250 | | | 147,250 |
| 8/27 or 30 | 38,750 | 108,500 | | | 108,500 |
| | | | | | |
| 9/17 (Petition) | | 108,500 | | | 108,500 |

[1] Values are based upon ticket prices of $7.75 (one-day ticket) and $14.00 (two-day ticket), which are consistent with the admitted $412,000.00 value of tickets released during 90-day period.

[2] Amount obtained by subtracting value of tickets remaining in the possession of UAB, Knoxville from the balance owing on Ticket Loan.

Thus, 90 days preceding the filing of the petition PLM owed a principal balance of $630,000.00 on the ticket loan debt. During the 90-day period, PLM made five payments on principal totaling $521,500.00.

Again, the parties have stipulated that each such payment was (1) a transfer of property of PLM (2) to a creditor (3) on account of an antecedent debt owed by the debtor before such transfer was made (4) made on or within 90 days preceding the filing of the petition. FDIC (successor in interest to UABK) does not attempt to rebut the presumption of PLM's insolvency during the 90-day period. 11 U.S.C.A. § 547(f) (1979).

Once more, then, the court must determine the hypothetical situation the creditor would have occupied had no transfers been made during the 90-day period. As the table above shows, prior to the first such transfer during the 90 days (on June 25) UABK held a possessory security interest in $263,500.00 worth of tickets. Assuming that none of the five transfers were made, then no further tickets would have been released (since UABK's further release of tickets was explicitly conditioned on the receipt of such payments). UABK would

presumably have retained its possessory security interest in the $263,500.00 worth of tickets it was holding prior to the first of the five transfers. Thus, had the five transfers not occurred, UABK would have occupied the following hypothetical position as of the filing of the petition:

| | |
|---|---|
| $ 630,000.00 | Total claim for debt assuming no transfers during 90 days |
| − 263,500.00 | Secured claim |
| $ 366,500.00 | Total unsecured claim for debt assuming no transfers during 90 days |

However, as a result of the transfers made during the 90-day period, UABK's actual position with respect to this debt was as follows:

| | |
|---|---|
| $ 108,500.00 | Total claim for debt |
| −0− | Secured claim |
| $ 108,500.00 | Total unsecured claim for debt |

Here, again, UABK improved its position to the extent that it reduced the unsecured claim it would otherwise have had in the absence of the transfers. It was again preferred over other unsecured creditors to the extent of this improvement in position. The extent of that preference may be calculated as follows:

| | |
|---|---|
| $ 366,500.00 | Hypothetical unsecured claim for debt assuming no transfers during 90 days |
| − 108,500.00 | Actual unsecured claim for debt as result of transfers |
| $ 258,000.00 | Improvement in position as result of transfers during 90 days (i.e., preferential transfers) |

■ FDIC asserts exceptions to avoidability under § 547(c)(1), (2), and (4).[8] The transfers are not within the § 547(c)(1) "contemporaneous exchange" exception. A transfer within the scope of § 547(c)(1) must have been *"intended by the debtor and the creditor ... to be a contemporaneous exchange* for new value given to the debtor." 11 U.S.C.A. § 547(c)(1) (1979) (emphasis supplied). As Patrick's testimo-

ny makes absolutely clear, the parties never intended the releases of the possessory security interest to be paid for contemporaneously. Indeed, the collateral was released in order to enable PLM to sell the tickets and generate sufficient funds to begin payments on the loan debt. Patrick's testimony makes clear that because of the "substantial" financial status of PLM and other ticket loan recipients, UABK simply accepted the fact that the release of the tickets without contemporaneous payment would, and did, leave UABK in a continually undersecured state. Payments on such antecedent, unsecured debt clearly had the effect of diminishing the estate.

■ Nor is the § 547(c)(2) "ordinary course of business" exception applicable. To be excepted under § 547(c)(2) the transfer must have been "made not later than 45 days after such debt was incurred." 11 U.S.C.A. § 547(c)(2) (1979). PLM incurred the loan debt on April 28, 1982. Clearly, the first transfer (on June 25, 1982) was made more than 45 days after the debt was incurred.

Furthermore, specifically regarding the release of tickets after the initial preferential transfer on June 25, 1982, the court has already given credit for the value of those tickets in determining the amount of the preference. In calculating the preference, the court assumed that UABK would not have released the $263,500.00 in tickets but would have retained its security interest in the tickets. Thus, out of the $521,500.00 transferred, the court has already given credit for the $263,500.00 value of these tickets. None of the tickets released after June 25, therefore, need be considered under the § 547(c)(1) contemporaneous exchange, § 547(c)(2) ordinary course of busi-

---

**8.** 11 U.S.C.A. § 547(c)(4) (1979) provides:

    (c) The trustee may not avoid under this section a transfer—

    .   .   .   .   .

    (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

    (A) not secured by an otherwise unavoidable security interest; and
    (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ....

ness, or § 547(c)(4) subsequent advance exceptions to avoidability.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.